Concord Railroad *v.* Greely.

## CONCORD RAILROAD *v.* GREELY.

The constitution of New-Hampshire is not so much a grant of specific powers as a limitation upon the exercise of general powers. Therefore, whether the general court have not all the power justly appertaining to a legislature, except so far as restrained by that constitution and the constitution of the United States, *quere?*

The twelfth article of the bill of rights, prohibiting the taking of private property for public uses, without the consent of the owner, or the consent of the representative body, by implication forbids the taking of such property for private uses, and authorizes the legislature to appropriate it by law to public uses.

What are public uses, justifying the exertion of this power, is a question for the court in deciding upon claims dependent upon the act of the legislature under color of it.

The determination of the legislature as to the expediency of taking private property for a public use, is final and conclusive in each case, affording a lawful ground for the act.

A railroad is in general such a public use as affords just ground for the taking of private property and appropriating it to that use.

A railroad of a private corporation, if for the use of the public, paying a toll to the owners, subject to be regulated by law, is such an object as to justify such appropriation of private property.

The constitution of the United States, which forbids that private property be taken for public use without just compensation, does not restrain the legislation of the general court of this State.

PETITION, setting forth that the petitioners have located their railroad through certain lands of Joseph Greely, and of other persons named, situated as described in the petition; that they have not been able to agree with those parties, or any of them, for the purchase of such land, or as to the sum or sums to be paid for taking the same for the road; that they have filed with the clerk of the court of common pleas for the county in which the lands lie, security for the damages, as required by the act of December 23, 1840, and praying for an appraisal of the damages to those owners, according to law.

The petition was filed in the court of common pleas, and an order of notice, returnable at the August term, 1841, was issued, in pursuance of which Joseph Greely and others of the parties appeared; and a commission to Simon P. Colby, Hiram Monroe and Perley Foster was granted, authorizing them to make the appraisal, and a return of their doings under the commission. By their return, made at the February term of that court, in 1842, it appeared that they had given notice to the parties, and made an appraisal of damages to Joseph Greely at a sum named in the report. Other particulars sufficiently appear in the opinion of the court.

*Upham* (with whom were *C. H. Atherton, Farley,* and *D. Clark*), for the petitioners, cited and commented upon 1 Bald. 205, *Bonaparte* v. *Cam. & Am. R. R.;* 7 Peters 247, *Barron* v. *Mayor of Baltimore;* id. 551, *Lessee of Livingston* v. *Moore;* 20 Johns. 106, *Rogers* v. *Bradshaw;* 8

Wend. 85, *Livingston* v. *Mayor of New-York;* 14 id. 51, *Bloodgood* v. *Mohawk & Hudson R. R.;* 20 Johns. Ch. 343, *Jerome* v. *Ross;* 2 id. 166, *Gardner* v. *Newbury;* 7 Pick. 495, *Charles Riv. Bridge* v. *Warren Bridge;* 4 Little, (Ky.) 323, *Jackson* v. *Winn;* 4 T. R. 794, *Plate Manufacturers* v. *Meredith;* 1 Bl. Com. 139; Grotius *de Jure,* b. 3, ch. 19; ch. 20, sec. 7; Puff. *de Jure,* b. 8, ch. 5, secs. 3 and 7; Bynk. Ques., b. 2, ch. 15; 2 Kent 339.

*Abbot & Fox,* for the defendant.

Gilchrist, J.*  The first section of the charter, which was granted in 1835, authorizes this corporation to locate and construct a railroad from a point in the south line of the State, in either of the towns of Hudson, Pelham or Salem, or in Nashua Village, to the town of Concord. The road is not to be made more than six rods in width; and for the purpose of cuttings, embankments, &c., the corporation are authorized to take as much more land as is necessary for the proper construction and security of the road.

By the seventh section the corporation are holden to pay all damages that may arise to any person or corporation, by taking their land or other property for the railroad, when the same cannot be obtained by voluntary agreement, to be estimated by a committee to be appointed for that purpose by the court of common pleas for the county wherein such damages shall accrue; and said court may issue execution, founded upon the report of such committee, against the corporation, for such sum in damages as the committee shall report, together with costs.

On the 22d day of May, 1841, the corporation filed the petition in the court of common pleas for the county of Hillsborough, stating, among other things, that they had

* Parker, C. J., did not sit.

located their road over land of Joseph Greely, of Nashua, and had taken his land for the purpose of the railroad; that they had not been able to agree with him for the purchase of the land, or on the damages to be paid him for taking it, and that they had filed with the clerk security for the damages, as required by law. Upon this petition an order of notice was issued, and, at the August term of the court of common pleas, an appointment was made of a committee to appraise the damages to Mr. Greely and others, and they appraised his damages at the sum of four hundred dollars.

At the February term of the court of common pleas in 1842, upon the coming in of the report of the committee, Mr. Greely filed twenty-one exceptions.

The first of these is, because his lands were taken without his consent, before making any compensation therefor, and for private purposes, and that all the statutes authorizing such taking of lands by such corporations are repugnant to the constitution of this State, and to the constitution and laws of the United States.

The second exception is, because no authority is given by law to the court of common pleas to appoint a committee to appraise the damages in such cases.

The third exception is, because the several acts respecting the Concord Railroad corporation are private, and special in their nature, affecting his interests and rights injuriously, and were enacted without notice to him or to the public.

In answer to the first exception, the corporation say, that they are lawfully and constitutionally authorized to take the land of Greely for the use of the railroad in the manner they have done.

In answer to the second exception they say, that the court of common pleas had all the power which they have assumed to exercise in the appointment of the committee, and in the proceedings consequent upon that act.

In answer to the third exception, they say that they had a right to take the lands of Greely in the manner in which they were taken, by the laws of the State. Answers are also made to the other exceptions.

To these answers, Greely replies substantially by demurrer, saying that the answers are insufficient in law, and that the report ought not to be accepted.

Such are, in substance, the exceptions taken by the defendant to the acceptance of the report, which are based upon the ground that the charter of the corporation is unauthorized by the constitution of this State. They raise the question, brought before us by this case for the first time, whether the charter of the corporation be authorized by the constitution; in other words, whether the constitution of New-Hampshire has authorized the legislature to incorporate individuals, with power to take the lands of other persons for the uses of railroads intended for the conveyance of freight and passengers, the profits of which shall belong to the stockholders. And, laying aside, for the present, the consideration of any question that might arise under the constitution of the United States, and any question as to the mode provided by the law for making compensation for the lands taken, the necessity of making which, in some manner, no one doubts, we propose to consider the question in its relations to the constitution of New-Hampshire.

There is but little in the constitution or bill of rights bearing directly on this question. The general powers with which the legislature is invested are stated in the fourth clause of that part of the constitution which treats of the general court.

That body is authorized " to make, ordain and establish all manner of wholesome and reasonable orders, laws, statutes, ordinances, directions and instructions, either with penalties or without, so as the same be not repugnant or contrary to this constitution, as they may judge

for the benefit and welfare of the State, and for the governing and ordering thereof, and the subjects of the same."

If a law be not repugnant or contrary to the constitution, it will be valid, and should be enforced, however inexpedient it may be in fact, or may appear to be to the public, or to those entrusted with the administration of justice. If it be repugnant, or contrary to the constitution, it should not be enforced, and will be invalid, however proper it may be in fact, or however much the public necessities may seem to require it. The whole question of expediency or inexpediency, and whether a law be or be not for the benefit and welfare of the State, is given to the legislature, subject only to the condition that it shall not be repugnant or contrary to the constitution.

If, then, the charter in question be thus repugnant, we must pronounce it invalid without regard to the public convenience, or to the amount of capital that may have been invested under it. If it be not repugnant, our duty will be to declare it a constitutional law, and to give effect to it as such, whether it be an expedient or an inexpedient one.

The twelfth clause of the bill of rights admits of a more direct application to this question than any other to be found in the constitution, but even this clause has not within itself all the requisite precision to enable us to determine the question. It is in these words:

"Every member of the community has a right to be protected by it in the enjoyment of his life, liberty and property; he is, therefore, bound to contribute his share in the expense of such protection, and to yield his personal service, when necessary, or an equivalent. But no part of a man's property shall be taken from him or applied to public uses, without his own consent, or that of the representative body of the people."

Now, so far as we may judge of the meaning of an instrument from the language used, and the connection in which a sentence is found, the framers of the constitution intended to speak in these two sentences of the duty of protection which the community owed its members; of the reciprocal duty which the citizens owed the community, of paying for that protection, and of the manner in which the property of the citizens should be taken and applied to defray that expense. They say, in a more condensed form, " The community must protect its members; each member is bound to pay for that protection; but his property shall not be taken from him, or applied to public uses, without his own consent, or that of the legislature."

Now here is a public use indicated by the nature of the subject. To resist foreign aggression; to put down domestic insurrection; is to furnish to the member of community that protection in the enjoyment of his life, liberty and property. To provide a mode by which he shall be recompensed for property justly or unjustly taken from him, is to protect his property. To defray the expenses of a necessary army, the expenses incident to the administration of justice, the citizen is bound to contribute a proportion of his property, in pursuance of a law for that purpose, or of his voluntary act. These are public uses, in the largest sense of the word; for without some provision for cases and emergencies of this description, no community could exist in a civilized state; and these are undoubtedly among the public uses which were contemplated by the makers of the constitution.

If then it be true that the twelfth article of the bill of rights was intended only to declare the duty of the citizen to pay his just share of the expenses of civil government, in such manner as might be provided by the legislature, the charter before us is not repugnant or contrary to the constitution, for this is the only clause with which it has the appearance of coming in conflict.

But let us suppose that the intention of the article was not merely to state a principle declaratory only of the reciprocal rights and duties of the government and the governed, but that the language was intended to include all cases where the property of a citizen is taken from him. Even upon this ground it would be difficult to maintain the position that the charter is repugnant and contrary to the constitution—trying that instrument by the language it contains, and laying out of sight arguments derived from other sources. A man's property shall not be taken from him without the consent of the legislature. The implication is, that with that consent it may be taken from him; and here the corporation have obtained the consent of the legislature. So his property shall not be applied to public uses without the consent of the legislature. But if the purpose of a railroad be a public use, that consent has been obtained. But the words of the former part of the sentence, literally taken, would justify the legislature in taking a man's property from him and giving it to another; for if a law prohibit the doing of a thing in specified cases, it carries with it, by implication, a license to do it in general. And this result, erroneous as it might seem to one who had not reflected on the origin of power, as admitted in this country, is not startling to any one who is not afraid to go as far as sound reasoning will lead him. What is the power of a State legislature in those particulars in which it is not limited by the constitution? Clearly it is supreme within its appropriate sphere. It may make all such laws as do not outrage the rights of the person and of property, upon a proper regard to which civilized society depends so much for its existence; and when we say that it cannot make a law thus obnoxious, we mean rather that society could not exist if such laws were passed, than that the constitution has in terms prohibited them. Indeed, the constitution consists not so much in grants of power as in limitations upon its exercise. It

declares that the legislature shall not make such or such a
law ; that this or that thing shall not be done ; as if, but
for such a prohibition, the general powers of the leg-
islature were such that they might do so. And why
might not the legislature, but for these limitations, do the
acts and pass the laws which by the constitution they are
restrained from doing ? There is an essential difference
in this respect between the constitution of this State and
that of the States generally, and the constitution of the
United States. The latter is made up entirely of delegat-
ed powers. " All powers," it is there said, " not dele-
gated to the United States by the constitution, nor pro-
hibited by it to the States, are reserved to the States re-
spectively, or to the people." But the constitution of
this State is not so much a constitution delegating power,
as a constitution regulating and restraining power. All
power, in the largest terms, applicable to such a subject,
is conferred by the people, through the constitution, upon
the general court, subject to the condition, in its exercise,
that it shall pass no laws repugnant to the limitations and
restrictions in the constitution. " The legislature of a
State," says Mr. *Butler*, the late attorney-general of the
United States, in the case of *Beekman* v. *Saratoga Railroad
Co.*, 3 Paige 58, " unless restrained by the constitution
would even have power to take private property for pri-
vate use."

This, however, is not the kind of reasoning to be appli-
ed in endeavoring to ascertain the meaning of a constitu-
tion, which, expressed, from the necessity of the case, in
large and comprehensive terms, contains broad declara-
tions of principles merely, which are to be applied to
cases as they arise, in the liberal spirit which dictated the
language of the instrument.

Viewing the question, therefore, in the light thrown
upon it by these considerations, we have no doubt that a
law providing merely that the property of A should be

taken from and given to B, either with or without a consideration, would be repugnant to the constitution. Not indeed to the letter of any particular clause contained in it, but to its spirit and design, which, throughout the whole, discountenance the idea that the property of the citizen is held by any such uncertain tenure as the arbitrary discretion of the legislature in a matter of mere private right, unconnected with any considerations of public utility. Such a law would not be so much in repugnance to the constitution as it would be to the principles which hold human society together; which, while they recognize the power of the legislature to be supreme, do not admit it to be arbitrary. Burlamaqui Polit. Law, part 3, chap. 1, secs. 10–18. The right of eminent domain authorizes the taking of private property only when required by the public interest.

The same spirit which takes us beyond the mere letter of the constitution, and which will not permit us to circumscribe the rights of the citizen by the language of the instrument in its literal meaning, will compel us to go abroad for the true meaning of the terms used, if a definition of them cannot be found in the constitution. Admitting, then, that the twelfth article in the bill of rights prohibits the legislature from taking the property of a citizen from him against his consent, and applying it to any other than public uses, the question arises whether its application for the necessary purposes of a railroad be an application of it to the public use.

The meaning of these words cannot be ascertained in reading the constitution. No attempt is there made to define them, nor is there any clause in that instrument which, by its bearing upon them, teaches us the precise meaning which they were intended to bear. We must, therefore, look elsewhere for a true construction.

The words are very comprehensive, and may include a multitude of objects. Their construction is a matter for

Concord Railroad *v.* Greely.

judicial decision ; because, however decided may be the opinion of the legislature that property in a given case has been taken for a public use, still, whenever the question arises whether it has thus been taken, within the meaning of the constitution, it becomes our duty to determine it. The opinion of the legislature is not final upon this, more than upon any other point, where claims, cognizable in this court, depend upon the question whether or not an act of that body is or is not in conflict with the constitution. Thus, even if the legislature should declare that an act taking the property of A, and giving it to B as his private property, was an application of it to public uses, no one would contend that such a declaration made that public, which, in its nature and object, was private.

Upon the question what is and what is not a public use, various considerations have been urged, both before us and in different parts of the Union. It has been said that property could not be properly alleged to be taken for the public use, unless, when taken, it should belong to the public as owning it; that the words substantially mean, that the property should be changed, by the act of application, and should belong to the community at large. This position can be maintained only upon the assumption, that the words " public use" are equivalent to the words " public ownership," or with other words which express the idea that the private property, by the act of application, becomes the property of the public. There is nothing in the constitution that authorizes us to extend the words " public uses" into such a meaning. No one contends that land taken for a common highway is not taken for the public use ; and yet the community own nothing but a right of passage, and a right to keep it in repair. The only distinction, in that respect, between a common highway and a railroad is, that in one case the public pay for the right of way, and are compensated by the use and enjoyment of it; while, in the other, the cor-

poration pay for it, and receive a compensation in the tolls which they take from those who desire to use it. This, then, cannot be the criterion by which to determine if the use of the property taken be a public use or not.

Again, it has been argued, that the public uses for which private property can be taken must be such as existed when the constitution was adopted, and that, as railroads were unknown at that time, an application of private property for their use could not have been contemplated by the constitution. This argument would prove too much, because it would show that society should remain where it stood fifty-three years ago, and would make us forget all the progress that the human race has made in that time in the arts, in intelligence, in the science of government, and in all that elevates a nation. This position would confine the powers of the constitution to limits within which it cannot reasonably be supposed to have been intended to be confined; restraining the otherwise versatile energies of the government from adapting themselves to new exigencies that might arise in the anticipated duration for which it was created, and limiting the benefits it was designed to confer upon the State to such as were capable of being accomplished by means then known; as if physical science and discovery could never yield new elements of power and wealth, and the wisdom of man could never devise other avenues than were then in use, for the pursuit of the legitimate ends of society, and which might require the strong and benignant arm of the government to aid in opening. The makers of the constitution had not in view the subject in question. They did not intend to include, as among the uses for which private property might be taken, the construction of a railroad. But they knew nothing of it, and it is equally plain that they did not intend to exclude it. There is no indication that it was ever their purpose to declare what were the public uses intended, but to leave the question

to be decided as cases might arise requiring the action of government and the adjudication of courts. It cannot, therefore, reasonably be argued, that because an improvement, whether of a physical, intellectual or a moral nature, was not known at the date of the constitution, it cannot, although public in its character and objects, derive aid from the power in question, and that the charter in question is for any such reason unwarranted by that instrument, and therefore illegal.

It has been and may be said that powers of this kind cannot be exercised except through the medium of a public corporation; that this is not a public but a private corporation, and consequently cannot take the lands of individuals for its purposes. It is unnecessary now to undertake to make a precise definition of the nature of a public corporation as distinguished from a private corporation. The line between them is often-times difficult to be distinguished. Definitions are to be found in the books, it is true, of a public corporation; but the definitions do not exclude all cases which are not included in them. The question involved in this discussion is, not what is a public and what is a private corporation, but whether this corporation be one that may hold the land of an individual for the public use. To settle this point it seems necessary first to determine what is the public use, in the sense of the constitution; or, if the expressions there be so indeterminate that no accurate idea can be derived from them of the sense contemplated by the constitution, then what is the "public use," in the proper meaning of the words?

It will not probably be denied that the legislature may take the land of an individual, pay the damages therefor, appropriate the land or the right of way to the purposes of a railroad, and remunerate the State for the expense thus incurred by imposing a toll upon all persons who travel over it, and cause the receipts to be paid into the

treasury. This toll or fare would, in that case, be only a mode by which those who receive the immediate benefit of the road compensate the public for the money which the public has expended in building the road. This money may be returned in the shape of tolls, as supposed, or in the form of a tax levied like other taxes; and it should be levied for the benefit of the public, because all the expenses would have come from the public purse. The railroad, in the case supposed, would be for the public use, and for the public use the land would have been taken. This would, without doubt, be a public use.

If so, then why is it not equally for the public use, though the road be built by a corporation chartered by the legislature? Has it fewer advantages for the public? Is it less a public benefit? And where the charter, as in this case, is under the control of the legislature, have the public, and has each individual composing the public, less right to the use and enjoyment of it, and to be accommodated and considered, as to the amount of toll — the times of running the cars, the speed, and every thing else connected with the travel — than if the road were the property of the public? And does the public use of the railroad depend on ownership? To these questions we answer in the negative. And our opinion is, that whether the road be made at the expense of the State and paid for by fares paid by travellers, or whether it be made by individuals, acting under a law of the State, at their own expense, and for the sake of a remuneration to be derived from a like source, cannot be the criterion by which to determine whether the use be public, and the charter, in consequence, constitutional.

We have thus far examined the question as to what are the legitimate uses for which the property of citizens may be taken, by endeavoring to analyze some of the prominent objections supposed to be taken to the constitutionality of the charter, for the purpose of ascertaining whether

Concord Railroad *v.* Greely.

the true question were involved in any of them ; and we think it is not. It remains to us, therefore, to determine what meaning is to be attached to the words "public use," and whether that use exists here.

Not that we would undertake the very difficult, if indeed practicable task, of framing a definition which shall determine in every case the question of the validity of a law appropriating to such use the land of individuals. Such a definition should comprehend not only all the existing public purposes justifying such appropriation, but should anticipate the future exigencies of society, demanding new laws and varied exercise of the protecting and fostering aid of the State. It is sufficient for this occasion to say that the use of a thing may be considered public, so far as to justify the exertion of the legislative prerogative in question, if it be devoted to the object of satisfying a reasonable pervading public demand for facilities for travel, for the transmission of intelligence, and of commodities not extraordinary, as compared with those enjoyed by communities of like pursuits. Such objects rank themselves, in fact, among the first duties of a government, from the moment that it has secured itself against foreign aggression and established tranquillity within its own borders, as the necessary means by which civilization is achieved and perpetuated. Without these the citizen pines in seclusion. The bounties of nature and the fruits of his labor, which commerce would transmute into wealth, are wasted, and he provides himself with difficulty, if at all, with those things which embellish home, and render its appropriate enjoyments possible.

These objects are among the most onerous of the burdens to which the citizen is called to submit. A very large fraction of the improved land in the State is first devoted ; a highway is constructed at an expense which draws heavily upon the resources of the inhabitant; year after year he is required to repair the waste which the elements have

made, or the unavoidable wear occasioned by the appropriate use of it.

The history of this State shows plainly that they have been deeply considered by the people and their legislatures in these points of view, and that, while the large sums required have been liberally bestowed by the public for the construction and maintenance of the common highways, numerous charters have been asked for and obtained for toll-bridges and turnpike roads, inviting the investment of capital, for the purpose of aiding, in the promotion of these highly necessary objects of internal improvement, the infant resources of the public treasury. And the fact is very significant of the construction given to the constitution by its framers, and by their contemporaries, that within a very short time from its adoption a very large number of charters for turnpike roads were granted, containing provisions almost identical with the one which is the present subject of complaint. Nothing can more clearly demonstrate that the legislatures which assembled under this constitution within ten years after its adoption, repeatedly recognized a turnpike built by a private corporation for the use of the public, subject to the condition of paying a lawful toll, as a public use of land, sufficiently definite and decisive in its character to call for the exercise of the legislative power, conferred or recognized by the constitution, of taking the land of individuals and applying them to those uses. See charter of 10th N. H. Turnpike, Laws of 1803; Charlestown do. do. 1803; Londonderry do. do. 1804, and numerous others about the same period; most of which provide that the superior court or court of common pleas may, in case of disagreement between the corporation and the landowner, appoint a committee to assess the compensation to be paid by the former, and issue execution for the same. We do not advert to this practical construction given to the constitution by the men who framed it, and their contempo-

raries, the authors of the public opinion which gave it its true and effective origin, indicating the public wants and the general means by which they should be accomplished through a form of government, as decisive of the question as to its meaning. But unless we are bound to consider all question on the subject as put to rest by the plain letter of the instrument, and to deny that there is room for doubt, then evidence of contemporaneous construction may, by the principles of law, and by the obvious maxims of sound reason, be adduced as evidence of its meaning and design. For laws are founded, in general, upon the perception of an evil, or a danger, or of a public want, and are often framed with such express reference to it as to leave a latent ambiguity in their expressions, easily solved by those who shared in the perceptions of the framers of the laws, but not apparent to after generations, who have lost, by the lapse of time, that key to the interpretation. Thus, if a reasonable doubt arise upon the words of a statute, whether a certain thing is embraced within its probibition, evidence of the prevailing use or practice of that thing immediately after the passage of the statute, by the framers of it and the public in general, goes far to establish the proposition that it is not so included.

We have endeavored thus far to state the reasons which have occurred to us, why a charter of this description should not be held to be repugnant to the constitution. We are satisfied with the result to which these reasons lead us, without adverting to decisions which have been made upon the same or analogous questions in other States of the Union. But these all concur to sanction and confirm our opinion, by the reasons upon which they are based, and the authority of the tribunals which have announced them. *Beekman* v. *Sar. & Schen. R. R.,* 3 Paige C. R. 45; *Gardner* v. *Newburg,* 2 Johns. Ch. Rep. 162; *Scudder* v. *Trenton Delaware Falls Co.,* Saxt. 694; *Bona-*

*parte* v. *Camden & Amb. R. R.*, Baldw. 204; *Bloodgood* v. *Mohawk & Hudson R. R.*, 18 Wend. 9.

The legislature is the sole judge of the expediency of taking private property for public uses, within the limits of the constitution. *Varick* v. *Smith,* 5 Paige C. R. 137.

As to the question which arises under the constitution of the United States, providing, "nor shall private property be taken for public use without just compensation," we think that if the facts were wanting here, which take the case out of that clause in the fifth article of the amendment, the intention of the article itself was wholly foreign, and inapplicable to a case arising under a State law. The constitution of the United States was an act of the people to establish a general government. It assumes to invest its several departments with their appropriate powers, legislative, executive and judicial. And, although it pursues in so doing the strict plan of specifying these powers, and the cases in which they may lawfully be exercised, yet these grants of power are of necessity couched in general phrase, and their exercise is further guarded by general rules, of which a considerable number are contained in the articles of amendment. It was no part of the design of these articles, or of the constitution in any of its parts, to impose any restraint upon the government of the States, except just so far as to bring and to retain their action in harmony with that of the federal power. For no other purpose does a State admit the authority of that instrument, or the federal compact to control her, in the exercise of the ordinary functions of a State. *Bradshaw* v. *Rogers,* 20 Johns. 103–106.

Of the remaining exceptions, the ninth relates to matters that have been fully considered in this opinion. That the act incorporating this company is in some sense a private act, has been shown not necessarily to affect the real question raised; that is, whether the purposes for which the land is taken are such as justify the act.

Concord Railroad *v.* Greely.

The 4th, 5th, 6th, 8th, 11th, 12th, 13th, 14th and 19th relate to matters which are fully answered by denial, or by the setting up of matter in avoidance in the answers to those exceptions filed by the petitioners, and which are confessed by the general demurrer raising an issue of law. The case, we think, requires nothing more than this general reference to these answers. The 20th is a general exception, under which nothing is specified.

By the 15th, 16th, 17th and 18th, objection is taken to the course pursued by the committee in amending their report, in some particulars, without notice to the defendant, and assessing the damages at a meeting not notified to him. But these amendments, to the extent that they were made, appear to have been made under the directions of the court, or at the court's suggestion, and all before the expiration of the term at which the report was returned.

As to the tenth exception, it has been held in cases before road commissioners that the appearance of the party was a waiver of all irregularity in the notice, upon grounds which are undoubtedly applicable here. *Parrish* v. *Gilmanton,* 11 N. H. Rep. 293.

The statute of December 23, 1840, referred to in the 7th exception, clearly has no reference to railroad corporations which had not taken the lands prior to the period referred to in the act. Its object was to provide a particular remedy, to apply to particular evils therein contemplated.

The result, therefore, is that none of the objections which have been taken can prevail, and that the report must be accepted.

*Report accepted.*