March 21,
1876.                        PERRY v. KEENE.

                      *Municipal aid to railroads.*

The statute of this state (Gen. Stats., ch. 34, sec. 16), which authorizes towns to raise and appropriate money, &c., to aid in the construction of a railroad, is not in conflict with the constitution.

CHESHIRE COUNTY.

BILL IN EQUITY, brought by certain tax-payers in Keene against the city and its officers, praying for an injunction to restrain them from levying a tax, or in any other way raising or appropriating the money or credit of the city to aid in the construction of the Manchester & Keene Railroad. The question came before this court on an agreed statement of facts, which sufficiently appear in the opinions.

*Sargent & Chase* and *Hardy*, for the plaintiffs.

The legislature cannot lawfully interfere with private property, except in the following cases : (1) It may authorize it to be forfeited for crime, or sold for the owner's debts, judicially established. (2) It may take it for public use, under the power of eminent domain, on condition of just compensation ; but for any private use the legislature cannot touch the property of the citizen, no matter how much compensation is made. (3) It may condemn it, under peculiar circumstances, under the police power, when the property itself, or its use or situation, endangers the public health or safety. (4) It may be taken by the taxing power.

Taxes are burdens or charges imposed by the legislature upon persons or property to raise money for public purposes, or to accomplish some governmental end ; and without such public governmental use or purpose there can be no legal tax. The legislature has only the power to raise revenue by taxation for a public purpose, but when revenue is attempted to be raised for a purpose not connected with the public interest, it is no longer taxation, but robbery. *Hanson* v. *Vernon*, 27 Iowa 28—opinion by DILLON, C. J.

---

*SMITH, J., having presided in the circuit court, did not sit.

It is also there held that railroad companies are private corporations in all respects, except so far as they may be empowered to exercise the right of eminent domain in taking land for railroad construction ; that in all other respects they are private, and that their undertaking can no more be aided by taxation than can the undertakings of any other private corporation, or of an individual.

So, in *Whiting* v. *Sheboygan Railway Company*, 25 Wis. 167,—opinion by DIXON, C. J.,—it is distinctly held that, as to the use of the land for the purpose of a highway, and the right of the public to pass and repass over it and enjoy its advantages upon the payment of reasonable fare and charges, the corporation may be said to be public, but in all other respects it is private.  The road, with all its rolling-stock, buildings, fixtures, and other property pertaining to it, is private property, and operated and used by the company for the exclusive benefit and advantage of the stockholders.  This constitutes a private corporation in the fullest sense of the term, and stands just like an institution of learning, or a manufacturing company, or any other private company or individual, who may be engaged in some employment or enterprise that is supposed to be beneficial to the public : and a statute authorizing a tax for the sole purpose of making a gift of the money raised to a railway company, in which the state or the tax-payers have no ownership, is unconstitutional and void.

What is the meaning of the word tax ?  Webster says it is " a rate or sum of money assessed on the person or property of a citizen by government, for the use of the nation or state."  They are " contributions paid by the inhabitants of a country for the use of the government."  New Am. Ency., vol. 15, p. 307 ; *Pray* v. *Northern Liberties*, 31 Pa. St. 69; Cooley on Const. Lim. 479, 487 ; *Camden* v. *Allen*, 2 Dutch. 398 ;

" A public governmental use or purpose is involved in and is essential to the idea of a tax "—*Hanson* v. *Vernon*, 27 Iowa 48, 49.  " If the right to impose a tax exists, it is a right which in its nature acknowledges no limits," because the needs of the public, or the necessities of the government, can have no bounds set to them.  " The power to tax involves the power to destroy,"—that is, to levy a tax upon property equal to its full value. *McCulloch* v. *Maryland*, 4 Wheat. 431 ; *Bank* v. *New York City*, 2 Black 631 ; *Weston* v. *Charlestown*, 2 Pet. 449 ; Cooley's Const. Lim. 482, 483, and cases cited ; Sedgw. Const. Law 554, 555.

So that, if the legislature have the constitutional right and power to authorize a tax of three per cent. to aid this railroad, or, in other words, to levy three per cent. upon their valuation and give it to the railroad without reserving any right whatever in the city to manage or control said road, then they have the constitutional right and power to levy a tax upon all the property in the city of Keene, equal to the full value of such property, and give that to the same road.  In other words, the legislature might constitutionally authorize the bare majority in numbers of the legal voters in the city to give away every dollar of the property

of every citizen in the city, without any consideration or any compensation or any equivalent whatever, so far as a large minority are concerned who are never to be benefited by this road, but who, from the fact that they are already interested in other roads to which this new road is to be a rival, instead of being benefited, are to be in fact actually injured by such new road.

Private property can only be taken for public uses, and then only by the payment or the securing of a full compensation; but in this case the private property of these plaintiffs is taken not for a public use, but for one essentially private, and that without any compensation or equivalent. What this law does is simply to take the private property of A and give it to B without giving A any equivalent, simply because it is supposed, or claimed, that B, if he has the property, will make a use of it which will be more to the pecuniary advantage of the majority of the people than A would if he were left to do what he pleased with his own.

In the case of *Whiting* v. *Sheboygan Railway Company, supra,* C. J. DIXON considers and answers many of the arguments adduced in favor of the theory that railroads are public corporations, and therefore that money may be raised by taxation for their benefit.

1. It is assumed that whatever is a public use so as to justify the exercise of the power of eminent domain, is also a public use which will, under all circumstances, justify the exercise of the power of taxation. This position is proved fallacious, and fully answered. He shows, as does C. J. DILLON, in *Hanson* v. *Vernon,* p. 54, " that the taxing power and the right of eminent domain are, though in some respects kindred, essentially different."

2. Again: it has been said that property in the hands of these railroads is public property. This is shown to be false.

3. Again: it is said that a writ of mandamus will lie, at the instance of the state, to compel the company to build and operate the road, and that, when the public have such an interest, taxes may be levied. But this is all a mistake; no such power is shown to exist. In that case, and in this case, after the people of any particular place have levied and paid their gratuity in the form of a tax, there is nothing in the act of incorporation, nor in any law in that state or this, to bind the company to run a single car over their road, or to prevent them from taking up the track and abandoning the use of their road altogether.

4. It is also said that a gratuity can be sustained on the same principle that subscriptions for stock in similar companies are sustained: but a broad distinction is shown between the two cases. But the power to do either is doubted, and has been questioned by high authority. Judge Redfield doubts the authority of these cases—nor does Judge Cooley approve of the doctrine. 2 Red. on Railways, sec. 230, note; Cooley's Const. Lim. 213, 214.

There is also the case of *The People* v. *Township Board of Salem,* 20 Mich. 452, in which Judge COOLEY delivered the opinion, in which he showed that railroads in all other respects, except in regard to the

right of eminent domain, are private corporations just as much as manufacturing companies or institutions of learning; that their interests are all private, though their business may be supposed to subserve the public good and convenience, the same as the building of a saw-mill or the erection of a hotel, whether by a company or an individual, would be likely to do. Judge COOLEY's reasoning seems entirely conclusive upon this subject, and his arguments are commended to the careful consideration of the court.

I also wish to call the attention of the court to a note of Judge Redfield's upon this opinion of Judge COOLEY, found in the Am. Law Reg., vol. 9 (new series), p. 501; as also to a note of the same judge upon the opinion of APPLETON, C. J., of the supreme court of Maine, in the case of *Allen* v. *Inhabitants of Jay*, as found in the Am. Law Reg., vol. 12 (new series), 493. In the last note, Judge Redfield refers to the case then recently decided, of *Lowell* v. *City of Boston*, in the supreme court of Massachusetts. He says,—" Public use and public good have been too often regarded as synonymous terms, and consequently it has been maintained by reasonably good lawyers and good judges, that taxation, which it is conceded on all hands can only be resorted to for public uses, might be made to contribute to the support of all objects which conduced to the public good." And he thinks that railroads have been largely subsidized by towns and cities from the public treasury, mainly upon this mistaken ground.

The difficulty has been to distinguish clearly between a " public use," and one that only remotely contributed to the public good by increasing the business, wealth, or prosperity of a town or city; and he concludes that there is no argument in favor of contributing by means of municipal taxation towards the creation or maintenance of a railroad which can rest upon any other plausible ground except that of the public good, in the broad sense of general improvement in wealth and business, as well as population and other kindred modes of general advancement; " and this argument," he says, " if we comprehend the matter rightly, applies equally well in favor of both the projects embraced in the cases stated in this note, the one for erecting a saw-mill, box factory, and grist-mill, and the other for advancing twenty millions for building the city of Boston." But still he thinks these projects were justly pronounced merely private enterprises, and hence that gratuities to railroads, like gratuities for building saw-mills and other manufactories, or loans to aid in rebuilding the city of Boston, are not for any public use, however much they may conduce to the public good or to the general prosperity.

On this same point, see, also, case of *Wapello Co.*, 13 Iowa 404; *Lafayette* v. *Cox*, 5 Ind. 38; Cooley's Const. Lim., ch. 14, p. 487, *et seq.; Veeder* v. *Lima*, 19 Wis. 280; *Thompson* v. *Pettson*, 59 Me. 545; *Tyson* v. *School Directors*, 51 Pa. St. 9; *Freeland* v. *Hastings*, 10 Allen 570; *Curtis* v. *Whipple*, 24 Wis. 350; *Bloodgood* v. *Railway Co.*, 18 Wend. 65; *Taylor* v. *Porter*, 4 Hill 140; Sedgw. Const. Law 174, 175, 515; *Jenkins* v. *Andover*, 103 Mass. 94; *Com. Nat. Bank* v.

*City of Iola*, 2 Dill., C. C. R., 353; *Opinion of Judges*, 58 Me. 590,
*et seq.; Allen* v. *Inhabitants of Jay*, 60 Me. 124; S. C., 12 Am. Law
Reg. (N. S.) 481, and see note by Judge Redfield; *Lowell* v. *Boston*,
111 Mass. 454; *People* v. *Township Board of Salem*, 20 Mich. 452, and
cases cited; S. C., 9 Am. Law. Reg. (N. S.) 487; *Whiting* v. *Sheboy-
gan Railway Co.*, 25 Wis. 167, and cases cited; S. C., 9 Am. Law Reg.
(N. S.) 156; *Hanson* v. *Vernon*, 27 Iowa 28, and cases cited; *King* v.
*Wilson*, 1 Dill., C. C. R., 555; Dill. Mun. Corp., sec. 105, pp. 586, 587.

By our constitution, the right of " acquiring, possessing, and pro-
tecting property" is classed with the right of " enjoying and defend-
ing life and liberty;" and all these rights are declared to be the
" natural, essential, and inherent rights" of the citizens of this state.
Bill of Rights, art. 2. As a fundamental and essential right, the en-
joyment and defence of life, liberty, and property are here put, by a
special guaranty, above the altering or repealing power of the legisla-
ture. *Aldrich* v. *Wright*, 53 N. H. 399. " The power delegated by
the constitution, ' to make and ordain all manner of reasonable and
wholesome orders, laws,' &c., confers no authority to make an order
or law in plain violation of the fundamental principles of natural
justice, though the act may not be prohibited by any express lim-
itation in the constitution." *E. Kingston* v. *Towle*, 48 N. H. 57.
"A law providing merely that the property of A should be taken from
him and given to B, either with or without a consideration, would be
repugnant to the constitution,—not, indeed, to the letter of any par-
ticular clause contained in it, but to its spirit and design, which,
throughout the whole, discountenances the idea that the property of
the citizen is held by any such uncertain tenure as the arbitrary discre-
tion of the legislature in a matter of mere private right." *Concord
Railroad* v. *Greeley*, 17 N. H. 47, 55;—and see authorities collected by
DOE, J., in *Orr* v. *Quimby*, 54 N. H. 606, 607, 608, 609, 612, 613, 614,
615.

Looking at the constitution in the light of these and similar authori-
ties bearing upon its construction and true meaning, we cannot
doubt that this statute, authorizing a majority of the legal voters of
any town or city to take the property of all the minority without their
consent and against their will, and give it away as a gratuity to an en-
terprise which is hostile to the interests of such minority, although not
expressly prohibited by the letter of the constitution, is yet repugnant
to its true spirit and intent as gathered from the whole instrument,
and that such statute is and ought to be declared unconstitutional and
void.

*Lane*, for the defendants.

The plaintiffs, in their petition for an injunction against the defend-
ants, state that, December 11, 1874, the city councils of Keene passed
the following joint resolutions (and this the defendants in their an-
swer admit):

" Resolved by the city councils of the city of Keene as follows:

" That a sum equal to three per cent. on the last property valuation of the city of Keene, as made by the assessors thereof, be raised and appropriated as a gratuity to the Manchester & Keene Railroad Company, to aid in the construction of that part of said railroad which shall be laid out and established between Greenfield in the county of Hillsborough, and the terminus at the city of Keene; and such sum is hereby appropriated for that purpose, provided that no part of said sum shall be paid, in money or bonds, or be liable to be paid as aforesaid, to said railroad company, until said road shall be completed for use from said Greenfield to said Keene, or until the city councils shall have satisfactory guaranty from responsible persons that it will be so completed on or before the first day of December, A. D. 1878, and the councils shall so determine by joint resolution; and the city hereby reserves to itself the right to pay said gratuity in bonds of the said city, like as hereinafter described, to be taken by said railroad at par in discharge of this obligation."

At the same time another resolution was passed relating to the character, amounts, &c., of the bonds to be issued to raise the money.

Sec. 16, ch. 34, Gen. Stats., provides that " Any town may, by a two-thirds vote, raise by tax or loan such sum of money as they shall deem expedient, not exceeding five per cent. of the valuation thereof, as made by the assessors for the year in which said meeting is holden, and appropriate the same to aid in the construction of any railroad in this state, in such manner as they shall deem proper." Another provision of the statute extends this authority to cities as well as towns. And the positions understood to be claimed by the plaintiffs in this case are, that the law is unconstitutional and void, and the action of the city of Keene is without legal authority, validity, or force.

And the important question presented by the case is, whether the law, which authorizes towns and cities to raise and appropriate, in such manner as they shall deem expedient, a sum not exceeding five per cent. of its property valuation " to aid in the construction of railroads in this state," is unconstitutional and void. The petitioners ask for an injunction, on the ground that the law is unconstitutional, contrary to the principles of natural justice, and void;—and this claim is to be made out clearly and indisputably before an injunction will be granted. The presumption of law is, that every act passed by the legislature, in the course of its legislative duties, is constitutional; and it devolves upon the plaintiffs not only to remove this presumption, but to remove " all reasonable doubt" of its constitutionality. The duty of the judiciary, when these questions come before it for consideration, seems to be well and clearly stated by the court in *Rich* v. *Flanders*, 39 N. H. 312, where it is said that " when courts are called upon to pronounce an act of legislation, passed with all the forms and solemnities requisite to give it the force of law, invalid and void in consequence of its conflicting with some constitutional provision, courts will approach the question with great caution, examine it in every possible aspect, and ponder

upon it as long as deliberation and patient attention can throw any
new light upon the subject, and will never declare a statute void
unless the nullity and invalidity of the act are placed, in their judg-
ment, beyond all reasonable doubt. *Cooper* v. *Telfar*, 4 Dall. 14 ; *Wel-
lington's Petition*, 16 Pick. 95 ; *Lunt's case*, 6 Gr. 412 ;"—see, also, to
the same effect, *College* v. *Woodward*, 1 N. H. 114 ; *Merrill* v. *Sher-
burne, id.* 202 ; *Walker* v. *Cincinnati*, 11 Am. Law Reg. 354 ; *McCul-
loch* v. *Maryland*, 4 Wheat. 316 ; *Ogden* v. *Saunders*, 12 Wheat. 260 ;
*People* v. *Supervisors*, 17 N. Y. 241 ; *Olmstead* v. *Camp*, 33 Conn. 551 ;
*Bankhead* v. *Brown*, 25 Ill. 540.

What measures are of a character that brings them within the fair
meaning of the constitution authorizing them as public improvements
for the public use is for the consideration and determination of courts ;
and this is the extent of their judicial duties. The legislature is the
sole judge of the expediency of exercising the legitimate powers neces-
sary to carry out these measures for use. *Railroad* v. *Greeley*, 17 N.
H. 64 ; *Pet. Mt. Washington Road Co.*, 35 N. H. 140. In *Gilman* v.
*Line Point*, 18 Cal. 225, the court say that " the only test and crite-
rion of the admissibility of the power are, that the particular object
tends to promote the general interest in its relation to any legitimate
objects of government." In *Bradley* v. *R. R.*, 21 Conn., it is said that
" the use is to be regarded as public if a general public benefit results
from it." In *Fernald* v. *Company*, 47 N. H. 455, the court endorsed
the foregoing definitions as representing the general doctrine upon this
subject. It says that " it extends to all cases of general public utility."
To the same point, also, are *Bristol* v. *Chester*, 3 N. H. 534, and *Hazen* v.
*Essex Co.*, 12 Cush. 475. In fact, this liberal interpretation of the
phrase " public use " has been almost universally maintained by courts
for the advancement of the public welfare, physically and socially, in
the spirit and by the improved means of the present age.

For this purpose lands are taken for highways, for turnpikes, canals,
sewers, school-houses, parks, cemeteries, water-powers for mills and
factories, and other like purposes, on the sole ground that they are for
the public use. Not that they are an absolute necessity, or always of
pressing importance ; for some, and perhaps most of them, are not of
this character, but are only well calculated generally to promote the
pleasure, health, convenience, welfare, and prosperity of the commu-
nity, and are demanded and allowed, to meet, in a reasonable manner,
these needs and wants of a progressive people and age. For all these
purposes not only private property is taken, but the public are taxed,
or, rather, they generally tax themselves, through their town organiza-
tions, under the law. And not only is it constitutional and just, and
fully sustained by public opinion as well as by the courts, to aid by
public burdens all these measures for public pleasure, health, and pros-
perity, but a few years since it very properly assumed, to a consider-
able extent, burdens that rested upon a certain class of community to
perform military duty, by raising money by taxation for substitutes,
and for paying bounties to those who volunteered, though liable to be

drafted. *Shackford* v. *Newington*, 46 N. H. 422. The "public use" is not of a limited and technical meaning, but, as regards the right of eminent domain and the power of taxation, is alike broad and general in its application.

The plaintiffs claim that this law, which authorizes towns and cities to raise and appropriate a limited amount of money by taxation to aid in the construction of railroads in this state, is unconstitutional, on the ground that railroads are of a private character and interest, rather than of a public nature. And if they are really and substantially of a private nature, and mainly conduce to private purposes, profits, and gains, instead of being principally of a public character, and required for public purposes, uses, and ends,—for travel, for transportation, for communication, and transaction of business of all sorts between different places and sections of the country, having in these respects superseded mainly the common highway and the turnpike,—then there would seem to be some foundation for their claim ; for no one pretends that a law which would allow the majority in a town to raise money by taxation for the purpose of conferring a gratuity to a private person or a private corporation, for private rather than for a public benefit, would be constitutional.

The first question and the main question for consideration in solving this case, therefore, is, whether railroads, as authorized, constructed, and used in this state, are private concerns established by law, as their main object to promote private profits and gains, or are public enterprises, authorized and established for the public use and welfare. We contend that they are clearly of the latter character.

1. The statute laws of the state, from the earliest days of building railroads, have indelibly stamped that character upon them, and public opinion has fully sustained it. It is in this light only that private property and rights could be taken for their construction. They are declared by statute law to be " for the public accommodation like other highways, and at all times subject to the control of the legislature ; " that " all railroad corporations are public, and those in whom they are vested are public agents, so far as the security and protection of the public rights and interests are concerned ;" that, " being public highways, they can be laid out, built, maintained, and put in operation only by express grants of the legislature, or of authority derived from them." Gen. Stats., ch. 146, secs. 1, 2, 3. The proprietors are prohibited from selling, leasing, mortgaging, or discontinuing their road, without the consent of the legislature. Ch. 145, secs. 1, 2. In fact, the whole tenor of the laws relating to railroads, which are minute in detail, puts them entirely under the control of the legislature as public institutions, established and secured for public ends. The early history of the railroad agitations and discussions, which were sharp and able, resulted in the conviction of the public mind that they were necessary public improvements.

2. The decisions of our courts fully sustain the same views. It was authoritatively settled thirty years ago, in the case of *Concord R. R.* v.

*Greeley*, 17 N. H. 47, that they were creations of the public power for the public use ; and the same doctrine has ever been recognized as sound, and acted upon in legislation. *Marsh* v. *R. R. Co.*, 29 N. H. 37 ; *Company* v. *Fernald*, 47 N. H. 455 ; *Ash* v. *Cummings*, 5 N. H. 613 ;—see, also, to the same effect, Cooley's Const. Lim. 580, n. 2 ; *Walker* v. *Cincinnati*, 11 Am. Law Reg. 354. In every state in the Union, without exception, it is believed the laws authorize private property to be taken against the will of the owner, for a reasonable compensation, for the purpose of constructing railroads. And the right to exercise this power in this class of cases is invariably put upon the ground that railroads are of a public character, and constructed for the public use. No court has ever held that private property can be taken from one person and transferred to another as his private property. The exercise by government of the right of eminent domain is the employment of one of the highest attributes of sovereign power, and is never done except for public purposes.

3. The uses made of railroads, and their influence not only upon the material prosperity of communities, but also upon their social character, show that they are preëminently of public interest and importance. All the internal business of the country is done upon railroads. The good old days of stage-coaches for pleasure, and of six-horse teams for freight, are gone by. A place beyond railroad facilities has no temptations for business or for social enjoyments, and is on the wane in every good sense. Its business gradually falls off, its property depreciates in value, its live, enegetic citizens seek homes where the means of the present advanced state of civilization may be enjoyed, and the thriving homesteads of the past relapse into uncultivated wastes. No one can fail to see that railroads are a necessity to community ; and if they are to be built hereafter, it is to be done by the direct aid of the community. The time has long since passed when railroad stock has been taken in new railroads as an investment for expected dividends. Roads which have been constructed for many years past have obtained their means from towns and cities which would be directly benefited by them, and from additional means furnished by individuals, with the hope of incidental advantages that would result from their construction. Dividends from earnings have not been looked for, any more than would be done in laying out money for a common highway. And so it will be in the future. The public must aid largely in building them, or must go without them. Those who hope to be benefited must bear the burden. By a small tax, self-imposed, the public can be accommodated with railroads in other parts of the state where there are none now, which will add many times the amount of the outlay to the value of the property bearing the burden, and will increase the prosperity and population of the state.

4. It is a universally recognized rule of law, that states may levy taxes for the purpose of constructing and maintaining internal improvements. This has been done by all the states and by the general government.

It is also a well settled doctrine, that the legislature may delegate authority to corporations, or to individuals, to execute and carry out public improvements, and may give them all the power necessary to accomplish these objects. *Lebanon* v. *Olcott,* 1 N. H. 339 ; *Pet. Mt. Washington Road Co.,* 35 N. H. 141 ; *Olmstead* v. *Camp,* 33 Conn. 532 ; *Bolton Mill Dam* v. *Newman,* 12 Pick. 467 ; *Armington* v. *Barnett,* 15 Vt. 750 ; *Ash* v. *Cummings,* 50 N. H. 612 ; *Company* v. *Fernald,* 47 N. H. 444 ; Cooley's Const. Lim. 537.

Besides the foregoing cases, Judge Cooley, in a note on page 119, cites more than fifty cases, decided in a large number of states, and by the supreme court of the United states, sustaining the same doctrine, where towns and cities had raised money by taxation and appropriated it for internal improvements, of which a large number were railroads ; —see, also, 2 Red. on Railways 398, n. 9. I am not aware that the courts of more than one or two states, at the most, have uniformly held such laws unconstitutional when applied to railroads. The courts of Wisconsin hold such a law unconstitutional ; those of Michigan have also, by a divided court, held the same doctrine ; and those of Iowa have held both ways in quite a number of different cases, the earlier decisions having sustained the law ; but the later decisions, coming from a new court, have declared it unconstitutional and void. Everywhere else, so far as I have been able to learn, such laws have been sustained. But wherever they have been declared unconstitutional, it has been put upon the sole ground that railroads are of a private rather than of a public character ; that they are institutions essentially for private ends and gains, rather than for public uses and benefits—a position in conflict with the general judgment of courts and of mankind, and which, it seems to me, is mistaken in fact and erroneous in theory. For, at the same time that they hold to this doctrine, they also hold that railroads are of a public character to an extent that fully justifies taking private property for public uses—a doctrine that, to our mind, covers the whole case ; for nothing but the fact that it is required for the public use will justify taking private property against the owner's consent at all ; and the whole current of authorities, and the common-sense of the thing itself, sustain unqualifiedly the doctrine that money may be raised by taxation and appropriated in the construction of improvements for the same purpose. It would seem to be as high a degree of encroachment upon or interference with private property to take a man's homestead from him and tax him with the rest of the public to raise the necessary funds to pay for it, as it would be to tax him upon his property in connection with the rest of the community for the purpose of raising means to aid in constructing and completing a public improvement.

In those cases where the public exercise the right of eminent domain directly through their municipal governments,—as in the case of highways, water-works, parks, cemeteries, and other public improvements,— the exercise of this right itself implies necessarily the further right, not only to raise by taxation the necessary funds to pay for the property

taken for these purposes, but also the right to raise additional means in the same way, to complete the improvement according to its intended design and purpose; and ever afterwards to keep it in proper repair. If the state should elect to build a railroad, which it evidently might do, the same sort and extent of burdens would be imposed upon the public, with the same general result as to the rights and benefits to the people. They secure the right barely to use the property so taken and improved, as long as it shall be retained for such purposes, and no longer. And it is intended that every person shall have an equal right and opportunity to use and enjoy these improvements, subject to such reasonable rules and regulations as their peculiarities require. So, when the public improvements are secured through individuals or corporations, which are, in such cases, to some extent the instruments and trustees of the public, the process is somewhat different, but the result, in the most important respects, is substantially the same.

In the case of railroads, for instance, the property is taken in the name of the corporation, and paid for by the corporation; and to meet this expense, and the expense of putting it in the condition required to answer the purpose for which it is taken, and of keeping it in suitable repair to meet the public wants in future, and for keeping it in all its departments in constant readiness for the use and accommodation of the public, the corporation is allowed to take a reasonable toll or charge of those who use it, as a substitute for the direct tax which is imposed on the public when the same improvement is made through the instrumentality of municipal corporations. And it is definitely settled in this state, and it is the general doctrine, that these circumstances, and the fact that individuals may have a private interest in it, do not change its public character—*Ash* v. *Cummings*, 50 N. H. 613, *Railroad* v. *Greeley*, 17 N. H. 59, *Company* v. *Fernald*, 47 N. H. 444, *Pet. Mt. Washington Road Co.*, 35 N. H. 140, Cooley's Const. Lim. 532; and in this latter case the public is secured to the same extent that it is in the former, to wit, to the reasonable use of the property, for the purpose for which it is taken, until the corporation shall be discharged by law from keeping and maintaining such road " for the public accommodation, like other highways." It gains no rights, that can be sold or transferred as valuable property to others, in either case.

Nor can it change the character of the case, or the rights and privileges of the public, or the duties and obligations of the corporation, that, by the vote of the city, the amount appropriated is designated as a gratuity. It is not, in fact, a gift, and should not be considered by the parties as a gift for the benefit of the corporation, for the purpose, or with any intent or expectation, of making the stock a valuable dividend-paying stock to its subscribers. The voters did not so understand it, nor did the corporation, nor was such the design of the law. Its only purpose was, to enable a community to assist in securing to itself the advantages of a railroad, by rendering it a limited amount of assistance, where otherwise they must forego the benefit of such improve-

ments. The tax-payers do not burden themselves and their neighbors with taxes for the sake of making a valuable present to a corporation, or to any individuals. It is not, in any sense, a gift: it is an investment by the public, in a public enterprise, for a specific purpose, and that purpose is the advancement of the material interests and social comforts of the community;—and the public has entire security for the accomplishment of its intentions, through the present laws, and by means of future legislation, if it should be required. Individuals subscribe for stock, and sink their capital for expected incidental advantages in return. The public have aided in the construction of several important local roads within the last few years, and, in this light, have found it a profitable investment.

And again : we have already shown that public improvements may ·be made directly by the state, or through the agency of municipal corporations or railroad corporations, and that, in either case, they possess the same legal character and qualities. Is there any sound reason, in the nature of an enterprise of this kind, why these two methods may not be united, without changing their legal character ? Could the fact that individuals might contribute to aid the public in a given case, or the fact that the public might aid a corporation in a certain case, deprive the enterprise of its public character ? Could it possibly, on that ground—for there is no other—render that unconstitutional which, if done by either alone, would have been constitutional ? The state may tax the public for the construction of public improvements. In many instances they have built, or aided, directly or indirectly, in building railroads. But a state is as much bound to regard the principles of the constitution, in disposing of the public money or in taxing the public, as it is in passing laws authorizing towns or cities to do the same thing for themselves. If the principles of the constitution will authorize the state to aid in these enterprises, because they are public rather than private, they will justify the state, for the same reason, in passing laws allowing towns and cities to contribute towards the same improvements. This view is supported in *Ash* v. *Cummings*, 50 N. H. 613, and cases cited.

6. We have already shown that it is a universal rule, that private property may be taken for railroad purposes, but that it cannot be taken for strictly private uses ; and, also, that the extent to which laws may be passed, authorizing the exercise of the power of taxation to promote public improvements, is strictly and exclusively a legislative discretion, and partakes in no degree of a judicial character. If the object is of a public character and use, in the opinion of the courts, that is the end of their duty and jurisdiction in the matter.

Our courts hold railroads to be of a public character. This is within their authority. To enable them to be constructed, the legislature, in its discretion, has passed a law authorizing them to take private property for the purpose. This is one step. In the exercise of its further discretion, it has also passed another law, authorizing towns and cities to raise funds, by the usual modes of taxation imposed upon them-

selves, and appropriate them in aid of this public object;—and this is the second step, and the natural and usual one in making public improvements. Without this power the right of eminent domain would be futile and worthless, for there is no other legal way of raising the necessary compensation for the property, or for improving it for the public use. The right of taxation, in fact, lies at the bottom of the right of eminent domain, for this right rests upon adequate compensation, which can be secured by the public only by taxation;—and this second step rests upon the same principle as the first, and can be justified upon the same ground. Judge Cooley says, that "the right of eminent domain rests substantially on the same foundation, as each implies the taking of private property for the public use, on compensation made." But the compensation is different in the two cases. When taxation takes money for the public use, the tax-payer receives, or is supposed to receive, his just compensation in the protection which the government affords his life, liberty, and property, and in the increase in the value of his possessions, by the use of which the government applies the money raised by the tax; and either of these benefits will support the burden. Cooley's Const. Lim. 497, 559; *People* v. *Mayor of Brooklyn*, 4 N. Y. 422; *Williams* v. *Mayor of Detroit*, 2 Mich. 565; *Stowell* v. *Cleveland*, 1 Ohio (N. S.) 126; *Railroad Co.* v. *Connelly*, 10 Ohio (N. S.) 165.

7. The same principle which authorizes private property to be taken, or public funds raised by taxation to be used, in making one kind of improvement, on the ground that it is required for the public use and promotes the public welfare, will also justify taking private property in the same way, for the purpose of making another and a different improvement which is required for the public use and prosperity. The different degrees of importance supposed to belong to different measures, which come within the provisions of the constitution as being of a private nature, do not, in any case, control legislative authority. They do not confer, limit, or affect legislative power: they are proper matters for legislative consideration, and may sometimes render the exercise of that power impolitic, inexpedient, and unwise, but never unconstitutional.

8. That the law is constitutional is fully sustained by the decision of the supreme court of the United States in the case of *The Town of Queensboro'* v. *Culver*, 19 Wall. 83. This was an action originally brought in the circuit court of the United States for the northern district of New York, to recover the amount of interest warrants due on bonds which had been issued by the town of Queensboro', as a donation for building and operating a railroad to be built from Glen's Falls to the Saratoga & Whitehall Railroad. The law required a board of commissioners to be appointed to borrow $100,000, at a rate not exceeding seven per cent., on the bonds of the town, at not less than par; and the money they shall raise "shall be donated to such railroad corporation or association as has now or shall hereafter file articles of association to build and operate a road from the

village of Glen's Falls to the Saratoga & Whitehall Railroad," provided that no bonds should be issued until the taxable electors had decided in favor of the proposition. The law also provided for the final payment of the bonds and interest by taxation. The main defence in the case was, that the law was unconstitutional. The circuit court held it constitutional, and the case was carried to the supreme court on error, where the decision was affirmed.

Mr. Justice STRONG, who delivered the opinion of the court, used the following language in relation to the constitutionality of the law : " In view of the numerous decisions made by the highest courts of most of the states, including New York, as also of those made by this court, it ought to be considered as settled, that a state legislature may authorize a municipal corporation to aid in the construction of a railroad, in the absence of any express constitutional prohibition of such legislative action. There is no such prohibition to be found in the constitution of New York, and the courts of that state have many times held that the legislature has power to authorize cities and towns to subscribe for stock of a railroad corporation, to incur indebtedness for the subscription, and to impose taxes for the payment of the debt incurred. It is true, no case in the highest court of that state has determined the precise question now presented, namely, whether a municipal corporation may be empowered to donate its bonds to a railroad company, and collect taxes for the payment of the bonds ; but subscriptions for stock, equally with donations, are outside of the ordinary purposes of such corporations, and the design of both is the same. It is to aid in the construction or maintenance of a public highway : it is for the promotion of a public use. The inducement to a subscription may be greater than the inducement to a donation. In the one case, there may be a hope of reimbursement by the stock obtained ; in the other, there can be no such expectation. In both, however, the warrant for the exercise of the power is the same * * . The legislative act *, * was not mandatory : it was merely enabling. It authorized the issue and donation of the bonds, if approved by a popular vote. It was a mere grant of power upon conditions, coupled with a prescription of the mode in which the power granted might be exercised. And that it was a constitutional exercise of legislative power must be considered as settled affirmatively by the decisions of this court in *Railroad Company* v. *The County of Otoe*, 16 Wall. 667, and *Olcott* v. *The Supervisors of Fond du Lac County*, *id*. 678. It cannot therefore be maintained, as contended by the plaintiff in error, that the statute under which the coupons in suit were issued was transgressive of the power vested in the legislature." There is no " express constitutional prohibition in the constitution " of New Hampshire "against such legislative action," more than there is in New York. In this respect, both are alike.

To the same point we also refer to the decision, by the same court, in the case of *The Township of Pine Grove* v. *Talcott*, 19 Wall. 666, which was carried up on a writ of error to the district court of the United States for the western district of Michigan. The suit was by

Talcott, against the town, to recover the amount of certain railroad bonds which it had issued to aid in the construction of a railroad from Kalamazoo to South Haven, both in Michigan. The law under which they were issued was substantially like that under consideration, authorizing towns "to pledge their aid in the construction of railroads," by loan or donation, with or without conditions, by a majority vote of its electors, not exceeding ten per cent. of the last valuation of its real and personal property. The constitutionality of the law was sustained by the circuit court, and the town carried the case, for error, to the supreme court, where the former decision was affirmed, and the former decisions of the state courts were overruled or disregarded. In the course of their opinion the court say, that " it is insisted that the validity of the statute has been determined by two judgments of the superior court of Michigan—*People* v. *Salem*, 20 Mich. 452, *Bay City* v. *State Treasurer*, 23 Mich. 499—and that we are bound to follow those adjudications. We have examined these cases with care,—with all respect for the eminent tribunal by which the judgments were pronounced,—and we must be permitted to say that they are not satisfactory to our minds. We think the dissenting opinion in the one first decided is unanswered. Similar laws have been passed in twenty-one states. In all of them but two it is believed their validity has been sustained by the highest local courts. It is not easy to resist such a current of reason and authority. The question belongs to the domain of general jurisprudence. In this class of cases, this court is not bound by the judgment of the court of the state where the cases arise."

Had these two cases come under our observation before we had completed the other portions of our brief, we should have referred to them on several other important points in this case, which they clearly sustain.

If reason and authority can ever settle a controverted question, it seems to me they have effectually done it in this case, in favor of the constitutionality of the law.

*C. H. Burns*, for the Manchester & Keene Railroad.

The question which is raised in this case is, whether section 16 of the act relating to the powers and duties of towns,—ch. 134 of the Gen. Stats.,—authorizing towns (and cities by a subsequent act) to raise money to aid in the construction of railroads, is constitutional. It seems almost idle to discuss this proposition, inasmuch as there is not only no " express constitutional prohibition in our constitution against such legislative action," but the people of New Hampshire long since deliberately passed upon the question as to whether there should be such a provision introduced into the fundamental law of the state, and they decided by popular vote that it should not be done.

The constitutional convention of 1850 was composed of some of the ablest lawyers in the state, and among the amendments to the constitution proposed by this convention was one " prohibiting towns from

lending money, giving their credit, or taking stock in any corporation." The constitution in this respect stood then precisely as it does now. In the opinion of this able body of representative men, chosen from all parts of the state, in order to prevent towns from "lending money, giving their credit, or taking stock in any corporation," it was necessary to amend the constitution. This shows conclusively how that assembly viewed this matter.

When the proposed amendment was submitted to the people, they decided by an overwhelming vote to retain the right under the constitution to pass just such an act as they did pass fourteen years later, and which is now, for the first time, I believe, attacked as unconstitutional. The amendment was rejected. The issue was then made and decided. The people regarded it as settled, and enacted the law to which objection is now made.

The attention of the court is called to what has been done under this statute. The city of Concord aided the Sugar River R. R. to the amount of $50,000. The town of Newport voted an appropriation of five per cent. of its valuation to the same object; the town of Sunapee voted same amount; and Claremont aided the enterprise to the amount of $100,000. The city of Manchester voted $50,000 to the Suncook Valley R. R., and Epsom and Pittsfield voted five per cent. each to the same purpose. The city of Nashua took stock in the Nashua & Rochester R. R. to the amount of $200,000, and Sandown gave $20,000. The city of Nashua also gave a gratuity of $15,000 to the Peterborough R. R., and Lyndeborough, $3,000, Greenfield, $10,000, and Francestown, $6,250, to the same object. The town of Peterborough gave $40,000, and Jaffrey five per cent. of its valuation, to the Monadnock R. R.

Thus it will be seen at a glance that great enterprises have resulted from the exercise of the authority granted by this statute, and that no inconsiderable portion of the people of this state are directly interested in the decision of this important question. These large appropriations have been made and expended in the belief that they were not only legal and proper, but actually necessary to the development and protection of these several localities.

It is not easy to estimate the harm that would result from now holding this statute bad, and subversive of constitutional right. To do this, not only would the towns and cities above named be subjected to countless embarrassments, and perhaps litigation, but a fatal blow to the growth and prosperity of the state would most certainly be inflicted.

The policy of our courts has always been, and I trust always will be, not to disturb what has been done in good faith by the people at the ballot-box, or by the legislature in the exercise of its proper functions, unless it is shown, clearly and unmistakably, that such acts are contrary to reason, law, right, and precedent. The statute in question, I submit, is not only reasonable and right in spirit and purpose, but it is in accord with the popular sentiment of our people, as expressed in their laws and suffrages. It has the sanction of precedent, as shown in num-

berless decisions in many of the states of the Union, to which the attention of the court has been called in the defendants' brief; and thus it would seem to be fortified on every side with all the essentials of sound legislation.

LADD, J. " Any town may, by a two-thirds vote, raise by tax or loan such sum of money as they shall deem expedient, not exceeding five per cent. of the valuation thereof  *  *  and appropriate the same to aid in the construction of any railroad in this state, in such manner as they shall deem proper." Gen. Stats., ch. 34, sec. 16. In accordance with the provisions of this statute, the inhabitants of the city of Keene have voted a subsidy equal to three per cent. of their last property valuation, to aid in the construction of that part of the Manchester & Keene Railroad located between Greenfield and Keene. This sum, amounting to upwards of $130,000, is called a " gratuity " in the vote. It is, in fact, an appropriation of that amount, to be raised by a public tax, to the purpose of building a railroad, with no equivalent except the expected benefits to be derived from the opening of such railroad. The plaintiffs, who are citizens and large tax-payers in Keene, contend that the legislature, in passing the act quoted above, transcended the limits of their constitutional power ; that the action of the city in voting the gratuity is therefore without warrant of law ; and they ask for an injunction to prevent the issuing of bonds or the levy of taxes in accordance with said vote.

The question we are thus called upon to consider is an important one, not only in its legal aspects, but in its practical bearing upon the rights and interests of these parties, as well as others in a similar situation, both tax-payers and holders of municipal bonds heretofore issued for a like purpose under the authority of the act in question.

In one view, the duty of the court is extremely plain and simple; in another, it is very delicate, and not free from difficulty. We have not to inquire into the policy of the law, or, if the purpose be admitted to be public, whether the supposed public good to be attained was sufficient to justify the legislature in conferring upon two thirds of the legal voters of a town the power to devote not only their own property but that of the unwilling other third to such a purpose.

All mere questions of expediency, and all questions respecting the just operation of the law, within the limits prescribed by the constitution, were settled by the legislature when it was enacted. The court have only to place the statute and the constitution side by side, and say whether there is such a conflict between the two that they cannot stand together. If, upon such examination, there appears to be a conflict, and if the conflict is so clear and palpable as to leave no reasonable doubt that the legislature have undertaken to do what they were prohibited from doing by the constitution, the court cannot avoid the high though unwelcome duty of declaring the statute inoperative, because the constitution, and not the statute, is the paramount law ; and the court must interpret and administer all the laws alike.

The learned counsel for the plaintiffs have not pointed out the particular part or clause of the constitution which they say is violated by this statute. Their position, however, is, that the act authorizes the taking of private property, under the name and guise of taxation, and appropriating it to a use that is really and essentially private ; and that such a proceeding, being manifestly at war with those fundamental principles upon which the right of the citizen to be secure in the possession and enjoyment of his property depends, is in violation of all those provisions in the constitution established to guard and perpetuate that right. The proposition assumes this form ;—the legislature are forbidden by the constitution to exact money from the people of the state under the name of taxes, and apply it to a private purpose : this statute authorizes the act thus forbidden, and is therefore void. The first part of this proposition is admitted by the defendants, and so we need not now inquire in what particular provision of the constitution the inhibition is to be found. Whether it rests upon the commonly received meaning and definition of the terms taxes, rates, assessments, &c., used in the constitution, and the general guaranties of private property contained in the bill of rights ; or whether, by a fair construction of Art. 5, the levying of all taxes, municipal as well as state, is limited to the purposes therein named,—viz., for the public service, in the necessary defence and support of the government of this state, and the protection and preservation of the subjects thereof,—is at present immaterial, inasmuch as we are to start with the assumption that taxes cannot be imposed or authorized by the legislature for any other than a public purpose.

Is the building of a railroad a public purpose ? The legislature have undoubtedly passed their judgment on that question, and determined that it is. It is not to be denied that the levying of taxes is specially and entirely a legislative function, and the court are not to encroach upon the province of a coördinate branch of the government in the exercise of that power. Where is the line that divides the province of the court from that of the legislature in a matter of this sort ? The court is to expound and administer the laws, and there the judicial function and duty end. How much of the question, whether a given object is public, lies within the province of the law, and how much in the domain of political science and statesmanship ? When the judge has declared all the law that enters into the problem, how much is still left to the determination of the legislator ? Admitting, as has indeed been more than intimated in this state ( *Concord Railroad* v. *Greeley*, 17 N. H. 57), that it is for the court finally to determine whether the use is public,—what is the criterion ? What are the rules which the law furnishes to the court wherewith to eliminate a true answer to the inquiry ? In what respect does the question as presented to the court differ from the same question as presented to the legislature ? If the court stop when they reach the borders of legislative ground, how far can they proceed ?

If the legislature should take the property of A, or the property of all

the tax-payers in the town of A, and hand it over, without considera-
tion, without pretence of any public obligation or duty, to B, to be used
by him in buying a farm, or building a house, or setting himself up in
business, the case would be so clear that the common-sense of every one
would at once say the limits of legislative power had been overstepped by
a taking of private property, and devoting it to a private use.    That is
the broad ground upon which such cases as *Allen* v. *Jay*, 60 Me. 124,
*Lowell* v. *Boston*, 111 Mass. 454, and *The Citizens' Loan Association* v.
*Topeka, Sup. Ct. U. S.*[a] (not yet reported) were decided.    And yet,
what rule of law do the courts find to aid them in thus revising the
judgment of the legislature ?    Is it not clear that the question they
pass upon is the same question as that decided by the legislature, and
that they must determine it in the same way the legislature have done,
simply by the exercise of reason and judgment ?    What is it that settles
the character of a given purpose, in respect of its being public or other-
wise ?    It has been said that for the legislature to declare a use public
does not make it so—17 N. H. 57 ; and the same may certainly be
said with equal truth of a like declaration by the court.    A judicial
christening can no more affect the nature of the thing itself, than a
legislative christening.    Judging *a priori*, and without some knowledge
of the wants of mankind when organized in communities and states, I
do not quite understand how it could be predicated of any use, that it
is "*per se*" public, as is said by Dixon, C. J., in *Whiting* v. *Sheboygan
Railway Co.*, 9 Am. Law Reg. (N. S.) 161.    Of light, air, water, etc., the
common bounties of providence, it might, indeed, be said beforehand
that they are in a very broad sense public ; but it is not of such uses
that we are speaking.    Without knowledge of human nature, knowl-
edge derived from experience and observation of what may be needful
for the comfort, well-being, and prosperity of the people of a state ad-
vanced in civilization,—and knowledge, gained in the same way, as to
what necessary conditions of their welfare will be supplied by private
enterprise, and what will go unsupplied without interference by the
state,—I do not see how any use could be said to be *per se* public, or
how either a legislature, or a court, could form a judgment that would
not be founded almost wholly upon theory and conjecture.    No one
doubts that the building and maintaining of our common highways is
a public purpose.    Why ?    Certainly for no other reason than that
they furnish facilities for travel, the transmission of intelligence, and
the transportation of goods.    But why should the state take this mat-
ter under its fostering care, imposing upon the people a very great
yearly burden in the shape of taxes for their support, any more than
many others that might be mentioned, of equal and perhaps greater im-
portance to its citizens ?    Is it of greater concern to the citizen that he
should have a road to travel on, when he desires to visit his neighbor
in the next town, or transport the products of his farm or of his factory
to market and bring back the commodities for which they may be ex-
changed, than that he should have a mill to grind his corn,—a tanner, a
shoemaker, and a tailor to manufacture his raw material into clothing,

× 20 Wall. 655

wherewith his body may be covered ? Doubtless highways are a great public benefit. Without them I suppose the whole state would soon return to its primal condition of a howling wilderness, fit only for the habitation of wild beasts and savages. How would it be if there were no mills for the manufacture of lumber, no joiners or masons to build houses, no manufacturers of cloth, no merchants or tradesmen to assist in the exchange of commodities ? These suppositions may appear somewhat fanciful, but they illustrate the inquiry, Why is the building of roads to be regarded as a public service, while many other things equally necessary for the upholding of life, the security of property, the preservation of learning, morality, and religion, are by common consent regarded as private, and so left to the private enterprise of the citizens ? The answer to this question, surely, is not to be found in any abstract principle of law. It is essentially a conclusion of fact and public policy, the result of an inquiry into the individual necessities of every member of the community (which in the aggregate show the character and urgency of the public need), and the likelihood that those necessities will be supplied without interference from the state. Obviously it bears a much closer resemblance to the deduction of a politician, than the application of a legal principle by a judge. Should it be found by experience that no person in the state would, voluntarily and unaided, establish and carry on any given trade or calling, necessary, and universally admitted to be necessary, for the upholding of life, the preservation of health, the maintenance of decency, order, and civilization among the people, would not the carrying on of such necessary trade or calling thereupon become a public purpose, for which the legislature might lawfully impose a tax ?

Experience shows that highways would not be built, or, if built, would not be located in the right places with reference to convenient transit between distant points, nor kept in suitable repair, but for the control assumed over the whole matter by the state ; and so the state interferes, and establishes a system, and imposes an enormous burden upon the people in the shape of taxes, compelling them to supply themselves with what they certainly need, but need no more than they need shoes or bread,—and nobody ever complained that the interference was unauthorized, or the purpose other than a public one.

Enough has been said to show the delicate nature of the task imposed upon the court when they are called upon to revise the judgment of the legislature in a matter of this description. It is especially delicate for two reasons,—first, because the discretion of the legislature, with respect to the whole subject of levying taxes, is so very large, and their power so exclusive, that it is not always easy to say when the limits of that discretion and power have been passed ; and, second, because the rule to be applied is furnished, not so much by the law as by those general considerations of public policy and political economy to which allusion has been made. I do not deny the power and duty of the court, when private rights of property are in question, to settle those

rights according to a just interpretation of the constitution; and the discharge of that duty may involve a revision of the judgment of the legislature upon a question which, like this, partakes more or less of a political character. But before the court can reverse the judgment of the legislature and the executive, and declare a statute levying or authorizing a tax to be inoperative and void, a very clear case must be shown.

After the legislature and the executive have both decided that the purpose for which a tax is laid is public, nothing short of a moral certainty that a mistake has been made, can, in my judgment, warrant the court in overruling that decision, especially when nothing better can be set up in its place than the naked opinion of the court as to the character of the use proposed.

Certainly it is not for the court to shrink from the discharge of a constitutional duty; but, at the same time, it is not for this branch of the government to set an example of encroachment upon the province of the others. It is only the enunciation of a rule that is now elementary in the American states, to say that, before we can declare this law unconstitutional, we must be fully satisfied—satisfied beyond a reasonable doubt—that the purpose for which the tax is authorized is private and not public.

I have spoken incidentally of our common highways; and it has been said that their purpose is, to furnish to the public facilities for travel, for the transmission of intelligence, and the carrying of goods. No one will contend that to build and maintain them is not a public purpose. Indeed, the public nature of this use is so very obvious, that it has been classed among those said to be public *per se* ( *Whiting* v. *Sheboygan Railway Co.*, *supra*), standing in need of no credentials from the court to entitle it to legislative recognition. Wherein does the use of a railroad differ? What public benefit can be mentioned, that comes from the building of a common road, that does not come, in kind if not in degree, from the building of a railroad? It is not necessary to enlarge upon the benefits of either: they are, doubtless, numerous and varied,—so numerous, indeed, so interwoven with everything that distinguishes an intelligent, virtuous, rich, well organized, and well governed state, from a tribe of primitive barbarians, that an attempt to trace them all would be little less than an attempt to search out the sources of our civilization.

The point is, they are alike in kind; and when it is admitted that the construction of one class of roads is clearly, beyond all possibility of doubt, a public purpose, I cannot conceive upon what ground it is to be said that the construction of the other class is, beyond all reasonable doubt, a private purpose.

It is said that railroad corporations are private; that the roads are built and run for private gain; that the public can only enjoy the benefits offered by them upon payment of a toll,—and, therefore, their purpose is private. The short and conclusive answer to all this, in my mind, is, that the character of the agency employed does not and cannot

determine the nature of the end to be secured.   To say of a railroad corporation that it is a private corporation, and therefore the construction of a railroad is a private purpose, seems to me, in truth, no more logical, if less absurd, than to say of any officer or agent of the state,— He is an individual, with all the private interests and private associations of other citizens ; therefore the purpose of his office and of all his official acts is private.   The argument, that because a toll is granted, therefore the purpose must be private, carried to its logical results, would certainly declare the purpose of a very large number of public offices in the state to be private,—among them the secretary of state, justices of the peace and of police courts, registers of probate, registers of deeds, sheriffs, clerks of the courts, town-clerks, etc., etc.

If the purpose is public, it makes no difference that the agent by whose hand it is to be attained is private.   Nor, if the purpose were private, would it make any difference that a public agent was employed. The question, therefore, whether a railroad corporation is to be regarded as public, or private, or both,—that is, public in one aspect and private in another,—seems to me quite immaterial, and that the decision of that question one way or the other does not advance the inquiry we have in hand.

It. has been admitted by some, who have maintained with singular ability and zeal the position of the plaintiffs in this case, that the state might legally take into its own hands the whole matter of railroads within its limits ; might build, equip, operate, and control them, making use of no intermediate agents in the business,—because in that case the people would remain owners of the property into which their money had been converted.   With great deference, it seems to me, this is a concession of the very point in dispute.   The form of the argument seems to be this : The state cannot levy a tax for a private purpose.   (So much, all admit.)   The building of a railroad is a private purpose ; but the state may nevertheless levy a tax to build a railroad, provided the tax be large enough to carry through the whole enterprise without calling in the aid of any other agency ;—or, to draw from the same premises the conclusion sought to be established here, the state cannot levy- a tax for a private purpose.   The state may levy a tax to wholly build, equip, and run a railroad ; therefore the building of a railroad is a private purpose.   This does not bear examination.

Another argument may be noticed here.   It has been said by courts, whose decisions we are accustomed to regard with great respect, that, admitting the power of the legislature to authorize towns and cities to subscribe for stock in railroad corporations, and issue bonds or levy taxes in payment thereof, it does not follow that they can lawfully authorize the direct appropriation of the public funds to aid in the construction of a railroad where no stock is taken ; because, in that event, no interest or ownership results to the town in the property of the corporation, and no voice in the control and management of its affairs is secured.   I do not understand how this can be said by a court of law. Upon what ground can the legislature authorize the raising of a tax to

pay for stock in a corporation of any sort, unless the purchase of such stock will be a devotion of the public funds to a public service ? It is a matter of common knowledge that the original stock in railroad corporations often becomes worthless, or nearly so ; but whether such a result is to be apprehended or not, makes no difference, so far as I can see, with the argument. If the end in view is private and not public, the legislature might as well authorize a town to enter into copartnership with any private person, in the prosecution of any private enterprise or business, and furnish its stipulated proportion of the capital to be invested, by levying a tax, as to authorize it to purchase such stock, even were it likely to advance in value on their hands, and the people thus be gainers by the operation. Deny that the end is public, and at the same time admit that a tax may be levied for the purchase of the stock, and the inevitable conclusion appears to be, that towns may be authorized to engage in the private and perilous business of dealing in stocks, and so apply the public funds to a purpose as remote as any that can well be conceived from that permitted by the constitution, to say nothing of the fact that such investment must be made with a reasonable assurance that the money will be lost. Clearly, one or the other of these propositions must be changed ;—either we must admit that the end in view is public, or deny the power to purchase stocks when the end in view is merely a private end.

It is said that the power to tax involves the power to destroy ; and that this is true is well shown by the recent example of the state banks, whose existence was terminated by a tax of ten per cent. imposed by congress on their circulation. But how does this strengthen the position of the plaintiffs ? They say that if the legislature have the constitutional right and power to authorize a tax of three per cent. to aid this railroad, they have the constitutional right and power to levy a tax upon all the property in the city of Keene equal to the full value of such property, and give that to the same road. Suppose this be granted, what does it prove as to the object for which the tax is laid ? Is it not equally true that they might authorize a tax equal to the full value of all the property in the city for the support of the public schools, the public highways, or any other object of a confessedly public nature ? The suggestion is plainly of no force in an inquiry as to the nature of the purpose for which a tax has been authorized or levied, for the reason that the supposed power of destruction is a necessary incident of the taxing power, and follows it whatever be the object for which it is put forth, whether public and legal, or private and illegal. It amounts to little more, in the present case, than the truism that any governmental power may be abused by the agent in whose hands it is reposed.

But if the question on which this case must turn has been rightly apprehended, I think it was decided more than thirty years ago, in the case of *Concord Railroad* v. *Greeley,* 17 N. H. 47, where it was held that a railroad is in general such a public use as affords just ground for the taking of private property, and appropriating it to that use.

A glance at the early legislation in this state, with reference to the taking of land for railroads against the owner's consent, is sufficient, without looking elsewhere, to show that, for several years before the case of *Concord Railroad* v. *Greeley* arose, much doubt was felt by the legislature and the people at large as to the existence of such a right, and a strong disposition is manifest to deny its exercise. The first charters to railroad corporations granted the right to lay out their road, and necessarily take land for that purpose—see Private Acts of 1835, pp. 201, 212, 223, 264, Private Acts of (June session) 1836, p. 341, Private Acts of 1837, p. 336, Private Acts of 1839, pp. 456, 470 ; and at the June session, 1836, a general law was passed, entitled "An act to provide a more cheap and expeditious mode of assessing damages for lands or materials taken by railroad corporations," which unequivocally recognizes the existence and validity of the right thus conferred by the charters. Public Acts, June session, 1836, p. 299. This act was repealed at the November session of the same year, and an act substituted in place of it covering the same general ground, but more comprehensive and specific in its details, providing for an assessment of damages by jury in case the parties were not content with the award of the committee, &c. Public Laws, Nov. sess., 1836, p. 248. It is noticeable, also, that at the November session, 1836, an act was passed authorizing the town of Concord to purchase and hold stock in the Concord Railroad Corporation, to an amount not exceeding thirty thousand dollars. Public Acts, Nov. sess., 1836, p. 316. But before 1840, for reasons that are well known but need not be stated here, the public mind became somewhat agitated upon the general subject of the legal relations borne by railroad corporations to the people and government of the state, and the rights and duties of such corporations, as well as the power of the legislature to appropriate private property to their use without the owner's consent. We accordingly find that, at the June session of that year, an act of a somewhat sweeping character was passed, whereby the acts of June, 1836, and January, 1837, in reference to the assessment of damages, and the act authorizing Concord to purchase and hold stock in the Concord Railroad, were all expressly repealed. And it was further enacted, "That from and after the passage of this act, it shall not be lawful for any corporation to take, use, or occupy any lands, without the consent of the owner thereof, unless the construction of the works contemplated in the act of incorporation shall have been commenced prior to the passage of this act." Laws of June session, 1840, ch. 498, p. 438.

At the November session of the same year another act was passed, which, whether called forth by actual grievances or not, shows in a striking light the state of public sentiment and the temper of the legislature. It was enacted, "That from and after the fifteenth day of March, A. D. 1841, it shall be lawful for the owner or owners of any land, taken by any railroad corporation in the construction of their railroad, when such land-owner shall not have been fully compensated for the same, on or before the fifteenth day of March, 1841, to remove the rails from

said railroad, fence up the land, and take and retain possession of the same until entire satisfaction is made to the owner or owners of the land thus taken." Laws of November session, 1840, ch. 584, p. 504. This latter act was repealed by the Revised Statutes, which went into effect March 1, 1843 ; but the provision of the former, that no railroad corporation shall take any land for the use of such corporation without the consent of the owner thereof, was retained, and appears as sec. 1, ch. 142, Rev. Stats.

Things remained in this position until 1844, when an act was passed, entitled "An act to render railroad corporations public in certain cases, and constituting a board of railroad commissioners." Laws of November session, 1844, ch. 128. Section 8 of this act contains an elaborate provision for a lease under the seal of the state, signed by the governor and certified by the secretary of state, whereby the right to construct a railroad over the route proposed should be granted and guaranteed to the corporation, for a term not less than one hundred nor more than two hundred years, *for the public use and benefit*, with the right of user in the same to pass and repass with their locomotives, cars, and vehicles of transportation thereon, &c.,—a device for finding the way out of a dilemma which would not do discredit to the ingenious inventors of many of the legal fictions with which the common law still abounds.

The next year (1845) came the case of *Concord Railroad* v. *Greeley*, where the constitutional power of the legislature to authorize the taking of private property for such a use was strenuously denied. It is obvious, even without going outside the statutes just referred to for evidence, that this was a question which had seriously engaged the public mind, and one upon which opinions greatly differed. Under these circumstances, it was natural that the case should receive a careful examination by the court; and I think it may justly be said, that the opinion by Mr. Justice GILCHRIST is among the most valuable to be found upon the general subject of which it treats. He says,—" The constitution of this state is not so much a constitution delegating power, as a constitution regulating and restraining power. All power, in the largest terms applicable to such a subject, is conferred by the people, through the constitution, upon the general court, subject to the condition in its exercise that it shall pass no laws repugnant to the limitations and restrictions in the constitution." He considers the objection that the power of eminent domain cannot be exercised except through the medium of a public corporation, and says the question involved is, not what is a public and what is a private corporation, but whether this corporation be one that may hold the land of an individual for the public use. In considering the great question in the case, namely, whether the proposed use was public, he says,—" It is sufficient for this occasion to say that the use of a thing may be considered public, so far as to justify the exertion of the legislative prerogative in question, if it be devoted to the object of satisfying a reasonable pervading public demand for the facilities for travel, for transmission of intelligence and of commodities, not extraordinary as compared with those enjoyed

by communities of like pursuits. Such objects rank themselves in fact among the first duties of a government from the moment that it has secured itself against foreign aggression, and established tranquillity within its own borders. Without these the citizen pines in seclusion. The bounties of nature and the fruits of his labor, which commerce would transmute into wealth, are wasted, and he provides himself, with difficulty if at all, with those things which embellish home and render its appropriate enjoyments possible."

I am not aware that the soundness of this decision has ever been questioned ; certainly it has been acquiesced in and acted upon by the legislature and the people, as the undoubted law of the state ever since it was rendered. The legislature has again and again, in a variety of forms, directly and indirectly, declared the use to be public, and has jealously guarded against the possibility of an inference that the right thus to take land could be derived from any other source than the supreme law-making power of the state. Railroads are declared to be designed for the public accommodation like other highways, and therefore to be public ; and it is said that, being public highways, they can be laid out, built, maintained, and put in operation only by virtue of grants of the legislature, or of authority derived from them. They are required, in times of war, insurrection, or invasion, to transport soldiers, munitions of war, and other property of the state, as well as soldiers, munitions of war, and other property of the United States, and the mails of the United States, at such rates as the governor and council shall impose if the parties do not agree. They are forbidden to discontinue their roads, and required to keep them in good repair, and discharge their duties in carrying passengers and freight agreeably to their proper object and purpose—Gen. Stats., chaps. 145, 146 ; besides, their charters are always carefully guarded to prevent an inference that they are not the creatures of the state, charged with public functions and subject to legislative control.

Undoubtedly a legislative declaration, that a given use is public, cannot be regarded as conclusive to all intents, without denying the power of the court to interpret the constitution ; nevertheless it is true, that the creator of a thing may generally impose upon the work of his own hands such qualities and characteristics as he chooses ;—and when we see that the legislature, in establishing railroad corporations, has always been so careful, not only to bestow upon them attributes and powers consistent with no other idea than that their purpose is public, but to lay upon them also obligations and duties which would be clearly unjust and arbitrary in any other view ; and when, in addition to this, we find the statutes full of declarations that the use is a public use, it would seem that nothing which falls much short of absolute demonstration would warrant the court in holding that the use is, after all, private.

Thus far, indeed, the cases all agree. It is nowhere contended, and is not contended by the plaintiffs, that a railroad is not a public use in such sense that land, the private property of individuals, may be taken

for its construction. But a strenuous effort has been made to distinguish between the nature of a public use that warrants the exercise of the power of eminent domain, and that which warrants the exercise of the taxing power in its behalf. Of course the use which warrants the taking of land for a road-bed must be public, otherwise every charter granting that right, and every general law recognizing its existence and regulating the mode of its exercise, has been nothing less than an abitrary and despotic interference by the legislature with private rights of property, in flagrant violation of Art. 12 of the bill of rights, as well as the other provisions of the constitution whereby those rights are secured.

The argument, then, admits that the use is public, but holds that it is not sufficiently public, or is not public in the particular way, to bring it within the category of objects for which taxes may be imposed : either in degree or kind, the public quality which it confessedly possesses falls short of that required by the constitution to justify an exercise of the taxing power.

It is incumbent on those who undertake to maintain this distinction, to point out clearly the differences on which it rests. An assertion that it does exist is not enough, nor is the argument advanced by a repetition of such assertion, even though made in confident and emphatic terms. What is the rule wherewith we are to determine when a given public use is of a character to warrant the exercise of one power and not the other ? What is the principle to be applied ? No one will contend that the power of eminent domain and the taxing power, though similar, are in all respects identical ; but all agree that neither can be exercised except for a public end. Which is the higher power ? or, in other words, which requires the greater public exigency to call it forth ? What is the nature of those objects which lie on one side of the line, and what of those upon the other side ? Where is the line to be drawn, and what are the reasons that determine its location ? These are some of the questions not to be evaded, or met with much speech and ingenious ratiocination, but to be answered fairly and clearly, before a court can say that the legislature have beyond all reasonable doubt transcended their constitutional powers in declaring that a use which is of such character,—that is, public in such sense that private property may be taken and appropriated in its behalf,—is also public in such sense that taxes may be levied in its behalf. In those cases to which we have been referred by the plaintiffs' counsel, where an attempt to do this is made, it does appear to me the failure has been rendered only more conspicuous by the eminent ability of those who have undertaken the task. And, after a most careful examination of those cases, if we were to hold that a railroad, being a public use for which the land of individuals may be taken against their consent, is not a public purpose for which taxes may be imposed, I should be utterly at loss what sound reason to give for the distinction, or in what terms to frame a rule to govern the future action of the legislature in cases of a like description.

Unless the court are to stand between the people and their representatives and declare when the latter have misjudged in their deliberations, and set up limits to the legislative powers of the general court not found in the organic law of the state, it is clear to my mind that this law cannot be annulled by a judicial sentence or decree.

SMITH, J.  After the very full discussion by my brother LADD of the general principles upon which the decision of this case must rest, and in which I fully concur, I shall attempt to do but very little more than cite a few of the leading authorities which bear upon the questions we are considering, quoting freely therefrom so far as may be necessary to give a clear understanding of the view which the courts have taken of these questions.

We are asked to restrain the city of Keene from issuing its bonds to the amount of $130,000, in aid of the construction of the Manchester & Keene Railroad, pursuant to a vote of its city councils passed in the month of November, 1874, upon the ground that chapter 34, section 16, of the General Statutes, authorizing a town or city to raise, by tax or loan, money to aid in such construction, is an unconstitutional exercise of legislative power.

It is not claimed that the constitution of this state contains any express denial of power to the legislature to authorize a municipal corporation to aid in the construction of a railroad, and there is nothing from which such denial of power may be inferred.  The plaintiffs, in argument, refer to article 2 of the bill of rights, by which the right of acquiring, possessing, and protecting property is guaranteed to every citizen, and is thus put above the altering or repealing power of the legislature.  We are also referred to the fundamental rule laid down in *E. Kingston* v. *Towle*, 48 N. H. 57, that "the power delegated by the constitution ' to make and ordain all manner of reasonable and wholesome orders, laws,' &c., confers no authority to· make an order or law in plain violation of the fundamental principles of natural justice, though the act may not be prohibited by any express limitation in the constitution."  It may be conceded in the outset, that what the plaintiffs claim in this respect is not disputed.  If the statute in question is open to the objection that it is repugnant to the fundamental principles of natural justice, or infringes the natural, essential, and inherent right of a citizen to acquire, possess, and protect property, then it will be the duty of the court to declare the same unconstitutional.  The only question, then, is, whether this statute in question is unconstitutional.

There is no presumption in favor of the unconstitutionality of a statute.  On the contrary, the presumption is always the other way ; and it devolves upon any one who would question it, to establish its unconstitutionality beyond reasonable doubt.  Cooley's Const. Lim. 182, and numerous authorities cited in note 1.

The plaintiffs contend " that railroad corporations are private corporations in all respects, except so far as they may be empowered to·

exercise the right of eminent domain in taking land for its construction ; that in all other respects they are private, and that their undertaking can no more be aided by taxation than can the undertakings of any other private corporation or individual."

General Statutes, ch. 146, sec. 1, declares that "Railroads, being designed for the public accommodation like other highways, are public, and at all times subject to the control of the legislature." "Section 2. All railroad corporations are public, and trustees and others in whom any railroad is vested are public agents, so far as the security and protection of the public rights and interests are concerned." "Section 3. Railroads, being public highways, can be laid out, built, maintained, and put in operation only by virtue of express grants of the legislature, or of authority derived therefrom."

These provisions of the statutes are so clearly nothing more than a re-affirmance of the law, as it has been uniformly held in the courts of this and nearly every other state in this Union, that it is idle to do more than cite a few of the vast number of authorities upon this point. The first decision in our state is that of *Concord Railroad* v. *Greeley*, 17 N. H. 47, where, after a full discussion by GILCHRIST, J., it was held that a railroad is, in general, such a public use as affords just ground for the taking of private property and appropriating it to that use; and that a railroad of a private corporation, if for the use of the public, paying a toll to the owners, subject to be regulated by law, is such an object as to justify such appropriation of private property.

In *Great Falls Man'f'g Co.* v. *Fernald*, 47 N. H. 444, is an exhaustive opinion by PERLEY, C. J., where it was held that when property is taken for the public use it may be done by a general law, as in the case of highways, or by special acts, such as have been so often passed in reference to turnpike roads, railways, canals, aqueducts, &c. It is not necessary that the right should pass directly to the public. It may be given to a corporation technically classed as private, provided the use is of such general benefit as to give it a public character. When a given case falls within a class which is such in general nature and character that the legislature have power to take the right as for the public use, the court cannot inquire whether the power was discreetly exercised in such particular instance. *Pet. Mt. Washington Road Co.*, 35 N. H. 134;—see, also, the list of numerous acts incorporating canal and turnpike companies, and acts for the improvement of rivers, cited in the plaintiffs' brief in *Company* v. *Fernald*, p. 450.

In *Ash* v. *Cummings*, in an opinion by SARGENT, J., in which the doctrine of the above cases is cited with approval, the learned judge then adds,—"If it is constitutional to grant to a private company the right of thus taking property for public uses without the consent of the owner, it follows that it is none the less so to grant the same right to an individual, if it is done under similar restrictions and limitations, and subject to the same conditions. The use is just as public, and no more so, if the highway is built by a public corporation, or a private

company, or a single individual, provided the same road is built in each case, and subject to the same regulations and restrictions."

If anything more were needed to confirm this position, we need only refer to the case of *Olcott* v. *The Supervisors*, 16 Wall. 678, from which I quote, " that railroads, though constructed by private corporations and owned by them, are public highways, has been the doctrine of nearly all the courts ever since such conveniences for passage and transportation have had any existence. Very early a question arose whether a state's right of eminent domain could be exercised by a private corporation created for the purpose of constructing a railroad. Clearly it could not, unless taking land for such a purpose by such an agency is taking land for public use. The right of eminent domain nowhere justifies taking property for a private use; yet it is a doctrine universally accepted, that a state legislature may authorize a private corporation to take land for the construction of such a road, making compensation to the owner. What else does this doctrine mean, if not that building a railroad, though it be built by a private corporation, is an act done for a public use ? And the reason why the use has always been held a public one is, that such a road is a highway, whether made by the government itself, or by the agency of corporate bodies, or even by individuals, when they obtain their power to construct it from legislative grant. It would be useless to cite the numerous decisions to this effect which have been made in the state courts. We may, however, refer to two or three, which exhibit fully not only the doctrine itself, but the reasons upon which it rests." *Beekman* v. *Saratoga & Schenectady R. R. Co.*, 3 Paige 45; *Bloodgood* v. *Mohawk & Hudson R. R. Co.*, 18 Wend. 1; *Worcester* v. *Railroad Co.*, 4 Met. 564.

" Whether the use of a railroad is a public or a private one depends in no measure upon the question who constructed it, or who owns it. It has never been considered a matter of any importance that the road was built by the agency of a private corporation. No matter who is the agent, the function performed is that of the state. Though the ownership is private, the use is public. So turnpikes, bridges, ferries, and canals, although made by individuals under public grants, or by companies, are regarded as *publici juris*. The right to exact tolls or charge freights is granted for a service to the public. The owners may be private companies, but they are compellable to permit the public to use their works in the manner in which such works can be used. That all persons may not put their cars upon the road, and use their own motive power, has no bearing upon the question whether the road is a public highway. It bears only upon the mode of use, of which the legislature is the exclusive judge."

Regarding this question then as firmly settled, we are led to another, which arises for the first time in this state, although it has been before courts of most of the other states of this Union, and settled almost uniformly one way, and that is, whether, if there be no constitutional prohibition of any sort, the legislature of New Hampshire can authorize a municipal corporation to aid in the construction of a railroad by issuing

bonds, or raising money by tax or loan, to be given as a gratuity, or loaned to such railroad corporation.

The provision of the statute is as follows : "Any town may by a two-thirds vote raise by tax or loan such sum of money as they shall deem expedient, not exceeding five per cent. of the valuation thereof as made by the assessors for the year in which said meeting is holden, and appropriate the same to aid in the construction of any railroad in this state, in such manner as they shall deem proper "—Gen. Stats., ch. 34, sec. 16. By another provision of the statute, this section is made applicable to cities when voted by a two-thirds vote of each branch of the city councils.

It is not claimed that there is any express prohibition of this power in the constitution of this state. Nor do I know of any grounds upon which such prohibition may be implied. It has been argued on behalf of the plaintiffs that " the legislature has only the power to raise revenue by taxation for a *public* purpose ; but when revenue is attempted to be raised for a purpose not connected with the *public* interest, it is no longer taxation, but robbery." I should not be disposed to quarrel with any one who asserts this proposition, but I fail to see how it is applicable to this case. No one will assert that taxes may be imposed for a private use. But has it not been settled over and over again, in this and nearly every other state of the Union, that the construction of a railroad by a company incorporated by a state for the purpose of building it, and endowed with the state's right of eminent domain, is a thing in which the state has, as such, an interest? The legislature has reserved the right of altering, amending, or repealing the charter granted to the Manchester & Keene Railroad. The legislature has the power to control and regulate it. It can define its use, and regulate its tolls and rates of transportation. If a work made by authority of the state, subject to its regulation, and having for its object an increase of public convenience, is to be regarded as ordinary private property, then the long array of decisions above referred to must be laid aside as not only inapplicable, but useless.

In the constitutional convention held in this state in 1850, an amendment was adopted by the convention, and submitted to the people for ratification, which read as follows : " 12. No town or incorporated place shall have the right, either directly or indirectly, to suffer their credit to be used for the especial benefit of any corporation, or to raise money for the purpose of loaning the same to any corporation, nor for taking stock therein ; "—see Journal of Convention. This amendment was rejected by the people. Not only did it fail to secure the requisite two-thirds vote, but the majority against it was very large. Although this is not conclusive evidence that the people understood that by defeating the proposed amendment they already possessed the power to do what the amendment proposed to prohibit, yet it affords very strong evidence that the people were unwilling to deprive themselves of the power, if the occasion should ever present itself when they might desire to exercise it.

This statute was first enacted in 1864. P. L., ch. 2,890, sec. 2. According to the defendants' brief, at least twelve cities and towns have aided in the construction of railroads under the provisions of this act, without their power so to do having been challenged until the present case. This fact in itself is not perhaps entitled to much weight, except as showing that from the large number of people interested in the result of this suit, this question deserves very careful consideration.

Upon a question of constitutional law, the decision of the supreme court of the United States is the decision of a court of last resort, and is therefore entitled to our most respectful consideration. Turning then to the reports of that court, the case of *Railroad Company* v. *County of Otoe*, 16 Wall. 667, is found to be precisely in point. The constitution of Nebraska contained no prohibition against the power of the legislature to authorize a county to issue bonds in aid of the construction of a railroad.

The county of Otoe, having been authorized by the legislature, issued bonds to the amount of $150,000 in aid of the construction of a railroad. Certain of the coupons coming due, suit was brought to enforce their payment, which was resisted upon the ground that the legislature had not the constitutional power to grant such authority, and the case was carried by appeal to the supreme court of the United States. The opinion of the court was delivered by Mr. Justice STRONG, from which I quote: " Unless we close our eyes to what has again and again been decided by this court, and by the highest courts of most of the states, it would be difficult to discover any sufficient reason for holding that this act was transgressive of the power vested by the constitution of the state in the legislature. That the legislative power of the state has been conferred generally upon the legislature is not denied, and that all such power may be exercised by that body, except so far as it is expressly withheld, is a proposition which admits of no doubt. It is true that, in construing the Federal constitution, congress must be held to have only those powers which are granted expressly, or by necessary implication ; but the opposite rule is the one to be applied to the construction of a state constitution. The legislature of a state may exercise all powers which are properly legislative, unless they are forbidden by the state or national constitution. This is a principle that has never been called in question. If, then, the act we are considering was legislative in its character, it is incumbent upon those who deny its validity to show some prohibition in the constitution of the state against such legislation. And that it was an act of legislative power is not difficult to maintain. No one questions that the establishment and maintenance of highways, and the opening of facilities for access to markets, are within the province of every state legislature upon which has been conferred general legislative power. These things are necessarily done by law. The state may establish highways or avenues to market by its own direct action, or it may empower or direct one of its municipal divisions to establish them, or to assist in their construction. Indeed, it has been by such action that most of the

highways of the country have come into existence. They owe their being either to some general enactment of a state legislature, or to some law that authorized a municipal division of the state to construct and maintain them at its own expense. They are the creatures of law, whether they are common, county, or township roads, or turnpikes, or canals, or railways. And that authority given to a municipal corporation to aid in the construction of a turnpike, canal, or railroad, is a legitimate exercise of legislative power, unless the power is expressly denied, is not only plain in reason, but it is established by a number and weight of authorities beyond what can be adduced in support of almost any other legal proposition. The highest courts of the states have affirmed it in nearly a hundred decisions, and this court has asserted the same doctrine nearly a score of times. It is no longer open to debate."

In the same decision it is held that the prohibition, " that the property of no person shall be taken for public use without just compensation," has no reference to taxation. " If it has, then all taxation is forbidden, for ' just compensation ' means pecuniary recompense to the person whose property is taken equivalent in value to the property. If a county is authorized to build a court-house, or a jail, and to impose taxes to defray the cost, private property is as truly taken for public use without compensation, as it is when the county is authorized to build a railroad or a turnpike, or to aid in the construction and to levy taxes for the expenditure. But it is taken in neither case in the constitutional sense: the restriction is upon the right of eminent domain, not upon the right of taxation."

" There is no solid ground of distinction between a subscription to stock, and an appropriation of money or credit. Both are for the purpose of aiding in the construction of the road ; both are aimed at the same object,—securing a public advantage, obtaining a highway or an avenue to the markets of the country ; both may be equally burdensome to the tax-payers of the country. \* \* That the legislature of the state might have granted aid directly to any railroad company, by actual donation of money from its treasury, will not be controverted. \* \* The security against abuse of power by a legislature in this direction is found in the wisdom and sense of propriety of its members, and in their responsibility to their constituents. But if a state can directly levy taxes to make donations to improvement companies, or to other objects, which in the judgment of its legislature it may be well to aid, it will be found difficult to maintain that it may not confer upon its municipal divisions power to do the same thing. Counties, cities, and towns exist only for the convenient administration of the government. Such organizations are instruments of the state, created to carry out its will. When they are authorized or directed to levy a tax, or appropriate its proceeds, the state through them is doing indirectly what it might do directly. It is true, the burden of the duty may thus rest upon only a single political division ; but the legislature has undoubted power to apportion a public burden among all the tax-payers of the

state, or among those of a particular section. In its judgment, those of a single section may reap the principal benefit from a proposed expenditure, as from the construction of a road, a bridge, an almshouse, or a hospital. It is not unjust, therefore, that they should alone bear the burden. This subject has been so often discussed, and the principles we have asserted have been so thoroughly vindicated, that it seems to be needless to say more, or even to refer at large to the decisions. A few only are cited. *Blanding* v. *Burr*, 13 Cal. 343 ; *Guilford* v. *Supervisors, &c.*, 3 Ker. 143 ; *Stewart* v. *Supervisors*, 30 Iowa 9; *Bank* v. *Augusta*, 49 Me. 507 ; *Railroad Co.* v. *Smith*, 62 Ill. 268."

This very clear and satisfactory opinion was followed by another at the same term, in *Olcott* v. *Supervisors*, 16 Wall. 678, in which the same doctrine was reiterated; and again, in *Queensboro'* v. *Culver*, 19 Wall. 83 ; and yet again, in *Pine Grove* v. *Talcott*, 19 Wall. 666, where it is said,—" Similar laws have been passed in twenty-one states. In all of them but two it is believed their validity has been sustained by the highest local courts. It is not easy to resist such a current of reason and authority. The question belongs to the domain of general jurisprudence."

When a question is presented for our consideration, which, in the language of the supreme court of the United States, has been affirmed by the highest courts of the states " in nearly a hundred decisions," and in that court " nearly a score of times," I think we may well agree with that court that the question is " no longer open to debate," and I may well be excused from entering upon a discussion of its merits. I have therefore attempted but little beyond making use of some of the arguments adduced by that court, and clothed in the forcible language of the very eminent judge who delivered the opinion in *Railroad Company* v. *The County of Otoe*.

RAND, J., C. C. I concur. I think the conclusion reached by my brethren is supported by unanswerable arguments, and by a weight of authority much greater than that which can be cited in support of the opposite conclusion.

*Bill dismissed.*